James M. Cotten and Weatherford Bancshares, Inc. v. Weatherford Bancshares Inc., Joe E. Sharp, and Zan Sharp Statham and James M. Cotten

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-341-CV

JAMES M. COTTEN APPELLANTS

AND WEATHERFORD

BANCSHARES, INC. 

V.

WEATHERFORD BANCSHARES, APPELLEES

INC., JOE E. SHARP, AND ZAN

SHARP STATHAM AND

JAMES M. COTTEN 

------------

FROM THE 43
RD
 DISTRICT COURT OF PARKER COUNTY

------------

OPINION

------------

Appellant James M. Cotten filed this declaratory judgment suit against (1) Appellee Weatherford Bancshares, Inc. (WBI), a bank holding company, to enforce statutory inspection rights and for wrongful redemption of Cotten’s preferred stock and (2) Joe E. Sharp and Zan Sharp Statham individually for fraud, breach of fiduciary duty, oppression, and civil conspiracy regarding the wrongful redemption.  After the trial court granted Sharp and Statham’s no- evidence motion for partial summary judgment and Sharp, Statham, and WBI’s motions for directed verdict, the jury found WBI liable on the only remaining claim for rigging the redemption drawing.  The trial court entered a final judgment reflecting the jury verdict.  Both Cotten and WBI appeal.  We affirm in part, modify in part, and reverse and remand in part the trial court’s judgment as to WBI.  We affirm in part and reverse and remand in part the trial court’s judgment as to Sharp and Statham.

Background Facts

Since the early 1900s, Cotten’s family has held an ownership interest in First National Bank of Weatherford (the Bank).  In the late 1970s, the Bank created WBI, a holding corporation, to allow it to add bank branches.  WBI then bought all the shares of the Bank, and, in exchange for their ownership interest, gave the shareholders preferred shares in WBI.  Ultimately, a multiple-tier holding corporation scheme was developed.  Parker County Bancshares, Inc. became the top-tier parent holding company, owning 100% of First Parker Bancshares, Inc., which in turn owned 99.84% of WBI, which in turn owned 100% of First Weatherford Bancshares, Inc., which in turn owned 99.3% of the Bank.  Cotten and his family also held common stock in Parker County Bancshares.  Each holding company’s sole asset is the stock of the subsidiary directly below it.

In December 1993, Sharp purchased a majority of the common shares in Parker County Bancshares.  Sharp’s controlling interest in Parker County Bancshares automatically gave him the controlling interest in First Parker Bancshares, WBI, and the Bank.  After Sharp obtained a majority of the shares in Parker County Bancshares, he sought complete ownership of the company.  Cotten and his family, however, refused to sell their shares to Sharp.  Sharp then planned an involuntary merger that would require Cotten and his family to sell their shares in Parker County Bancshares to a new company Sharp had created.  After suit was filed for an appraisal of the fair price of the stock, Sharp acquired all of the Parker County Bancshares’s stock, including that of Cotten and Cotten’s family, giving him total control of Parker County Bancshares.  At the time of that suit, however, Cotten and his family still held preferred shares of stock in WBI, which were not affected by the suit.

Following Sharp’s takeover, Cotten began questioning him about non-payment of WBI dividends owed to Cotten as a preferred shareholder.  Then, in January 1996, Sharp and his daughter Statham, who together comprised the entire WBI board of directors, sent a letter to Cotten and his family informing them that their preferred shares had been redeemed.  Cotten objected to the redemption because he claimed it was not conducted as required by WBI’s articles of incorporation (the Articles).  Although the redemption was never officially rescinded, Sharp and Statham did not enforce it.

Cotten later noticed a discrepancy in some of the Bank’s public records; they showed a decrease of about $16,000 in the Bank’s capital stock.  Cotten then requested inspection of certain corporate books and records as provided by statute.
(footnote: 1)  Some, but not all, of the requested records were produced for inspection.  In May 1997, when Cotten insisted on inspection of the remaining documents, Sharp and Statham conducted what they characterized as a random drawing, whereby they redeemed Cotten’s preferred shares.  Thereafter, they refused inspection in part on the ground that Cotten was no longer a shareholder.

Cotten then filed suit against WBI to enforce his right to inspection and to declare the redemption of his shares a sham and a fraud.  Cotten also sued Sharp and Statham for fraud, breach of fiduciary duty, oppression, and civil conspiracy.  In January 2002, after suit had been filed, Sharp and Statham redeemed all the remaining preferred shares of WBI pursuant to the provision in the Articles that allowed total redemption of preferred shares.  On the first day of trial, the trial court granted Sharp and Statham’s no-evidence motion for summary judgment on Cotten’s fraud claim.  At the close of Cotten’s case, the trial court granted WBI’s motion for directed verdict on Cotten’s inspection claim and Sharp and Statham’s motion for directed verdict on the breach of fiduciary duty, oppression, and civil conspiracy claims.

The jury was only left with the question of whether the May 1997 redemption drawing had been “rigged,” which Cotten had raised based on the rigging allegation in his live petition.  The jury found that it had, returning a verdict for Cotten and awarding attorney’s fees against WBI.  By the parties’ stipulation, the trial court assessed damages.  The trial court found that although the May 1997 redemption of Cotten’s preferred shares was void, WBI’s January 2002 redemption redeemed all preferred shares, including Cotten's, and thus Cotten was only allowed damages from the date of the void redemption until January 7, 2002, when WBI redeemed all remaining preferred shares.  The trial court then issued a final judgment for Cotten, awarding him those restricted damages and attorney’s fees.

In five issues, Cotten argues that the trial court erred (1) by holding that he did not remain a preferred shareholder of WBI at all times subsequent to the void redemption drawing of May 1997; (2) by granting WBI’s motion for directed verdict (or by so ruling 
sua sponte
) as to his statutory inspection rights by holding as a matter of law (a) that he was provided access to the requested records, and (b) that he was not entitled to copies of them; (3) by granting Sharp and Statham’s no-evidence motion for partial summary judgment on his fraud claims; (4) by granting Sharp and Statham’s motion for directed verdict on his breach of fiduciary duty, civil conspiracy, and oppression claims; and (5) alternatively and only if this cause is remanded for trial at WBI’s request as to any issue pertinent to the validity of the May 1997 redemption drawing, that the trial court erred by holding, as a matter of law, that the Articles allowed redemption of “shareholders” and not “shares.”

WBI brings six cross-issues, arguing that (1) the trial court abused its discretion by admitting the testimony of an undisclosed witness, Rolanna Fitzgerald; (2) there is no evidence to support the jury’s finding that the May 1997 redemption drawing was “rigged”; (3) the trial court erred by finding that Cotten did not fail to mitigate his damages; (4) the trial court erred by not reducing the damage award by the amount that Cotten failed to mitigate his damages; and (5) the trial court erred by (a) awarding attorney’s fees to Cotten; and (b) failing to award attorney’s fees to WBI.

Inspection

In his second issue, Cotten argues that the trial court erred by granting WBI’s motion for directed verdict, holding that he was provided access to the corporate records he had requested and that he was not entitled to copies of them.  We agree with Cotten.

A directed verdict is proper only under limited circumstances:  (1) when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent or (2) when the evidence is insufficient to raise a material fact issue.
(footnote: 2) 
 In reviewing a directed verdict, we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not.
(footnote: 3)
 If the question to be decided is whether the losing party at trial raised a material fact issue, we consider all the evidence in a light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence and inferences; we give the losing party the benefit of all reasonable inferences created by the evidence.
(footnote: 4)  
If we determine that any conflicting evidence of probative value raises a material fact issue on any theory of recovery, then the directed verdict is improper because such an issue is for the jury to resolve.
(footnote: 5)
 Article 2.44C of the Texas Business Corporations Act states:

Any person who shall have been a shareholder for at least six (6) months immediately preceding his demand, or shall be the holder of at least five per cent (5%) of all the outstanding shares of a corporation, upon written demand stating the purpose thereof, shall have the right to examine, in person or by agent, accountant, or attorney, at any reasonable time or times, for any proper purpose, its relevant books and records of account, minutes, and share transfer records, and to make extracts therefrom.
(footnote: 6)

Furthermore, shareholders of a corporation are equitable or beneficial owners of the corporation’s assets.
(footnote: 7)  Consequently, Cotten, a preferred shareholder in WBI, is an equitable owner of First Weatherford Bancshares because WBI is the owner of all the stock in First Weatherford Bancshares. Cotten, therefore, is also an equitable owner of the Bank because First Weatherford Bancshares is the owner of 99.3% of the Bank.  Thus, Cotten has a statutory right to inspect documents of WBI, First Weatherford Bancshares, and the Bank.

In this case, the record reflects that there are fact issues regarding whether WBI provided Cotten with the requested documents.  There was evidence at trial that Cotten requested, among other things, inspection of any internal and external audit reports and all compilations, projections, and/or forecasts from any CPA.  The record also reflects that Sharp informed Cotten that none of those documents existed.  Cotten, however, produced evidence at trial that two WBI checks signed by Sharp were written to pay a CPA and one WBI check signed by Sharp was written to pay for an audit.  The record further reflects that although Cotten requested WBI audits and CPA reports and WBI paid for the audits and CPA services, the services were provided for the Bank.  The record shows that Sharp and Statham understood that Cotten was requesting the Bank audits and CPA reports that WBI had paid for.

Rolanna Fitzgerald, the administrative assistant to the Bank president at the time of the request, also testified that the holding companies had audits.  There is some evidence that Statham stated that, as a holding company, WBI's function was to attend all regulatory audits of the holding companies.  Sharp also testified that regulatory audits were conducted of the holding companies.  Thus, the record reflects issues of fact regarding whether audits and CPA reports existed that WBI refused to allow Cotten to inspect.  Consequently, the trial court erred by finding as a matter of law that Cotten was provided access to the requested records.

Furthermore, Cotten argues that he was entitled to copies of the corporate documents.  WBI contends, however, that Cotten was entitled to extracts of the records, not copies of them.  Although WBI contends that the term “extract” in the statute is unambiguous, it failed to provide us any definition of extract.  WBI simply suggests that because article 2.44B of the Texas Business Corporations Act states that a director may “make copies or extracts from books or records,” Cotten was entitled to extracts, not copies.  Furthermore, at trial, WBI stated that because the statute allowed extracts, Cotten was entitled to make a handwritten copy of the documents, not a photocopy.  We decline to interpret the statute so narrowly.

Black’s Law Dictionary
 defines “extract” as “[a] portion or segment, as of a writing; [t]o draw out or forth; to pull out from a fixed position.”
(footnote: 8)  It also references “estreat,” which it defines as “[a] copy or duplicate of some original writing or record.”
(footnote: 9)  
Webster’s Dictionary
’s definition of “extract” includes “to select and copy out.”
(footnote: 10)  The plain meaning of extract in the statute, therefore, includes copies of the records.
(footnote: 11)  Thus, the trial court erred by finding that as a matter of law, Cotten was not entitled to copies of the records under the statute.  We sustain Cotten’s second issue.

Breach of Fiduciary Duty

In his fourth issue, Cotten argues that the trial court erred by granting Sharp and Statham’s motion for directed verdict on his breach of fiduciary duty claim.  We disagree with Cotten.

While corporate officers owe fiduciary duties to the corporation they serve, they do not generally owe fiduciary duties to individual shareholders unless a contract or confidential relationship exists between them in addition to the corporate relationship.
(footnote: 12)  Due to its extraordinary nature, the law does not recognize a fiduciary relationship lightly.
(footnote: 13)  Therefore, whether such a duty exists depends on the circumstances.
(footnote: 14)
 Fiduciary duties may arise from formal and informal relationships and may be created by contract.
(footnote: 15)  An informal fiduciary duty may arise from a moral, social, domestic, or purely personal relationship of trust and confidence, generally called a confidential relationship.
(footnote: 16)  A confidential relationship exists where influence has been acquired and abused and confidence has been extended and betrayed.
(footnote: 17)  A person is justified in placing confidence in the belief that another party will act in his best interest only where he is accustomed to being guided by the judgment or advice of the other party and there exists a long association in a business relationship as well as personal friendship.
(footnote: 18)  Thus, the relationship must exist prior to and apart from the agreement that is the basis of the suit.
(footnote: 19)  And, although a confidential relationship is ordinarily a question of fact for the jury, it becomes a question of law when the trial court refuses to submit issues on fiduciary duty based on no evidence.
(footnote: 20)
 In this case, Cotten presented no evidence of a confidential relationship with either Sharp or Statham.  The evidence reflects that the only relationship that Cotten had with Sharp and Statham was restricted solely to corporate dealings.  Both Cotten and Sharp testified that neither cared for the other much and that they would each prefer never to deal with the other.  Cotten further testified that he did not trust Sharp or Statham.  Consequently, there is no evidence of a confidential relationship.

Additionally, although majority shareholders are sometimes said to stand in a fiduciary relationship with both the corporation that they control and with the minority shareholders, Sharp and Statham do not own any stock in WBI.
(footnote: 21)  The corporation that they own and control is the majority shareholder in this case.  Corporations are separate legal entities,
(footnote: 22) and Cotten failed to sue the majority shareholder corporation.  Cotten cannot piggyback his claims against the corporation onto Sharp and Statham.
(footnote: 23)
 Cotten argues that Sharp and Statham’s complete control of all the holding companies makes them fiduciaries.  Fiduciary duties may be owed by those in control to preferred shareholders.
(footnote: 24)  Those fiduciary duties are found by courts to be based on the articles of incorporation as a contract.
(footnote: 25)  In this case, the trial court found that the Articles did not constitute a contract between Sharp, Statham, and Cotten because there was no privity.  Because Cotten does not challenge the trial court’s finding that there was no contract, the finding is binding.  Thus, because the trial court found that the Articles did not constitute a contract, and the record does not reflect that there was any other contract between Sharp, Statham, and Cotten, there is no evidence that Sharp and Statham owed Cotten any contractual fiduciary duties.  Consequently, after reviewing the record under the proper standard,
(footnote: 26) we hold that the trial court did not err by granting Sharp and Statham’s motion for directed verdict on the breach of fiduciary duty claim.  We overrule this subissue.

Oppression

Also in his fourth issue, Cotten argues that the trial court erred by granting Sharp and Statham’s motion for directed verdict on his oppression claim.  We agree with Cotten.  The trial court held as a matter of law that there can be no oppression between common shareholders and preferred shareholders.  That holding did not defeat Cotten’s oppression cause of action, however, because he, a minority preferred shareholder, sued Sharp and Statham as directors of WBI, not as mere shareholders.

“Oppression” has been defined by courts as follows:

1.  majority shareholders’ conduct that substantially defeats the minority’s expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder’s decision to join the venture; or

2.  burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company’s affairs to the prejudice of 
some members
; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.
(footnote: 27)

Additionally, 
Black’s Law Dictionary
 defines “oppression” as “[u]nfair treatment of minority shareholders by the directors or those in control of the corporation.”
(footnote: 28)
 Because of the bank holding company structure, many internal conflicts are created that may lead to oppressive conduct.
(footnote: 29)  One of the conflicts that exists is between directors and preferred shareholders.
(footnote: 30)  The conflict is especially more apparent in a case such as this one, involving a corporation with a board of directors with controlling common stockholdings:
(footnote: 31)
 In th[o]se cases, both legitimate financial interest and virtually unlimited legal power merge in a way that is difficult to separate . . . .  Far more significant to preferred stockholders, and far more damaging from a financial perspective, are . . . conflicts where directors, even when acting in apparent good faith and in the absence of a particular financial interest in the transaction, can damage the interest of the preferred by furthering exclusively the interests of the common.
(footnote: 32)
Furthermore, in discussing internal conflicts as they apply to bank holding companies, it has been said that,

[In holding companies] the subsidiary’s directors are subject to the control of the [parent] holding company, often because they are high-ranking employees of the [parent] holding company.  In light of the dominant role played by the shareholder in the subsidiary’s operation, it seems disingenuous to pretend that the subsidiary’s directors can ever act truly independently of the wishes of the parent.  The directors will rarely be able to fairly carry out their duties in the horizontal conflict situation.
(footnote: 33)

Because the potential exists for oppressive conduct between directors and preferred shareholders, we hold that Cotten has a cause of action as a preferred shareholder against Sharp and Statham as directors of WBI.  In addition, there is some evidence to support Cotten’s oppression cause of action.

In this case, there is some evidence that Sharp and Statham damaged the interest of Cotten, a preferred shareholder, by furthering exclusively their own interest as common shareholders.  The parties agree that Sharp and Statham control WBI.  They not only serve as the board of directors in every holding company, but they are also majority common shareholders of the top-tier parent holding company.  The trial court’s findings show that the jury found that Sharp and Statham improperly redeemed the preferred shares.  Sharp and Statham’s improper redemption of the preferred shares, creating a financial benefit for themselves by decreasing the preferred share dividends that had to be paid out of capital they control, raises a fact issue regarding whether their conduct fits the second category of oppression—burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company’s affairs to the prejudice of 
some members
; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.
(footnote: 34)
 After our review of the record under the proper standard,
(footnote: 35) we cannot hold that as a matter of law there can be no oppression between directors and preferred shareholders.  Therefore the directed verdict on this claim was improper.  We sustain this subissue.

Civil Conspiracy

Additionally, in his fourth issue, Cotten argues that the trial court erred by granting Sharp and Statham a directed verdict on his conspiracy claim based on its holding as a matter of law that there could be no civil conspiracy because there could be no oppression.  We agree with Cotten.

In Cotten’s third amended original petition, he contends that Sharp and Statham conspired to deprive or impair him of his vested property rights and violate the Articles of WBI and applicable law.  An actionable civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.
(footnote: 36)  The essential elements are:  (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.
(footnote: 37)  A party may be liable for conspiracy to commit fraud without being liable for the underlying fraud.
(footnote: 38)  A defendant’s liability for conspiracy depends on “participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.”
(footnote: 39)

A corporate officer may be held individually liable for a corporation’s tortious conduct if he knowingly participates in the conduct or has either actual or constructive knowledge of the tortious conduct.
(footnote: 40)  Instigating, aiding, or abetting the wrongdoing constitutes participation.
(footnote: 41)  “It is settled law of this state that where a third party knowingly participates in the breach of a fiduciary, such [a] third party becomes a joint tortfeasor with the fiduciary and is liable as such.”
(footnote: 42)
 In this case, the jury question asked whether WBI rigged the drawing to redeem Cotten’s preferred shares, implicitly asking whether WBI committed a fraud.  Although the trial court properly held that there was no evidence that Sharp and Statham committed fraud, there is evidence that they participated in WBI’s fraud against Cotten.  Thus, oppression was not the only underlying tort for which Sharp and Statham could be liable for civil conspiracy.
(footnote: 43)  The record reflects that there was some evidence presented to the jury that Sharp and Statham, and thus WBI, agreed and planned to redeem Cotten’s preferred stock in violation of the Articles, and by doing so, deprived him of his preferred stock.  Furthermore, evidence was presented at trial that Sharp and Statham as corporate officers of WBI knowingly participated in the fraud by rigging the drawing.  Thus, issues of material fact existed for the jury on Cotten’s civil conspiracy claim.  Consequently, the trial court erred by holding as a matter of law that without oppression there could not be a civil conspiracy.  We sustain this subissue.

Fraud

In his third issue, Cotten argues that the trial court erred by granting Sharp and Statham’s no-evidence motion for partial summary judgment on his fraud claim.  We disagree with Cotten.

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense.
(footnote: 44)  The motion must specifically state the elements for which there is no evidence.
(footnote: 45)  The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.
(footnote: 46)
 We review the evidence in the light most favorable to the party against whom the no-evidence summary judgment was rendered.
(footnote: 47)  If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.
(footnote: 48)
 In this case, Sharp and Statham allege that Cotten’s fraud claim was pleaded as a common-law fraud claim, which only includes actual fraud.  Cotten alleges that both actual and constructive fraud were pleaded.  At common law, the term “fraud” means an act, omission, or concealment in breach of a legal duty, trust, or confidence justly imposed, when the breach causes injury to another or the taking of an undue and unconscientious advantage.
(footnote: 49)  Common-law fraud includes both actual and constructive fraud.
(footnote: 50)
 “Actual fraud” usually involves dishonesty of purpose or intent to deceive.
(footnote: 51)  The elements of actual fraud are:  (1) a false, material representation was made, (2) that was either known to be false when made or was made without knowledge of its truth, (3) that was intended to be acted upon, (4) that was relied upon, and (5) that caused injury.
(footnote: 52)
 Cotten presented no evidence to raise an issue of fact that he was injured because he actually relied on the misrepresentation of Sharp and Statham.  In fact, Cotten concedes that he did not actually rely on any representation made by either Sharp or Statham because he did not trust them, and he knew they did not follow the proper procedure to redeem his shares.  Thus, the trial court did not err to the extent that it held that there was no evidence of actual fraud. 

Constructive fraud, however, encompasses those breaches that the law condemns as “fraudulent” merely because they tend to deceive others, violate confidences, or cause injury to public interests, regardless of the actor’s mental state.
(footnote: 53)  Therefore, constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship.
(footnote: 54) Because we have already held that Cotten presented no evidence at trial of a fiduciary relationship between Sharp, Statham, and himself, he necessarily  presented no evidence of constructive fraud.  We overrule Cotten’s third issue.

Void Redemption
 

In his first issue, Cotten argues that the trial court erred by finding that although Cotten remained a preferred shareholder of WBI following the void May 1997 redemption, his shares were effectively redeemed in January 2002 when WBI redeemed all remaining preferred shares.  We agree with Cotten. Statutes, articles, or contract provisions on the redemption or retirement of stock must be strictly complied with.
(footnote: 55)  Any right of redemption must be exercised in accordance with the terms of the contract or instrument giving the right.
(footnote: 56)
 In this case, the Articles set forth the following redemption provisions:

The corporation, at the option of the Board of Directors, may at any time redeem the whole, or from time to time redeem any part of the preferred shares outstanding by paying in cash therefor the sum of $104.00 per share, plus all dividends declared but unpaid thereon as provided in this Article to and including the date of redemption, hereinafter referred to as the “redemptive price”, and by giving to each preferred shareholder of record at his last known address, as shown on the records of the corporation, at least twenty (20), but not more than fifty (50) days’ prior notice personally or in writing, by mail, postage prepaid, stating the class or series or part of the class or series of shares to be redeemed and the date and plan of redemption, the redemptive price, and the place where the shareholders may obtain payment of the redemptive price on surrender of their respective share certificates, hereinafter called “
redemption notice
.” [Emphasis added.]

After May 1997, WBI improperly considered Cotten’s preferred shares redeemed.  Because at trial the May 1997 redemption was found to be void, Cotten remained a preferred shareholder.  Cotten was therefore a shareholder at the time of the January 2002 redemption.  Because of WBI’s reliance on its improper May 1997 redemption, however, it was undisputed at trial that Cotten was not sent and he did not receive the proper redemption notice for the January 2002 redemption.  Consequently, the January 2002 redemption, as it would apply to Cotten, did not comply with the Articles.  As a result, the January 2002 redemption as applied to Cotten is also void.  Cotten therefore remains a preferred shareholder, and he is entitled to receive dividends until his shares are properly redeemed.

Because Cotten remains a preferred shareholder, the trial court erred by finding that his shares were effectively redeemed in January 2002 and limiting Cotten’s damages to dividends accrued from May 1997 to January 2002.  We sustain Cotten’s first issue.  Because of our disposition of WBI’s cross-issues, we do not reach Cotten’s fifth issue.
(footnote: 57)
CROSS-ISSUES

Admissibility of Testimony

In its first cross-issue, WBI argues that the trial court erred by admitting the testimony of Rolanna Fitzgerald, an undisclosed witness.  WBI states that Cotten did not disclose Fitzgerald in his discovery responses, that it timely objected to the testimony at trial, and that it requested that the trial court exclude her as a witness on the ground that Cotten failed to disclose her as a person with knowledge of relevant facts.  Furthermore, WBI argues that Texas Rules of Civil Procedure Rule 193.6(a) automatically excluded the witness at trial.  We disagree.

The record is devoid of any objection or evidence that the witness was not disclosed.  The record reflects only that WBI, during trial, presented an oral motion in limine to prevent Fitzgerald from testifying about a prior bad act of Sharp that she had testified to in her deposition taken by WBI.  The trial court granted the motion in limine, over Cotten’s objection.

Furthermore, WBI admits that Fitzgerald was named as a person with knowledge of relevant facts; it merely argues that Cotten failed to supplement his interrogatory responses to state her updated address.  One of the purposes of Rule 193.6(a) is to prevent trial by ambush.
(footnote: 58)  The record reflects that WBI deposed Fitzgerald before trial; thus, WBI had prior notice of her testimony and was not ambushed at trial.  Therefore, because the record does not reflect an objection or evidence of a failure to disclose the witness and the record does reflect that the trial court granted WBI’s only request regarding the witness’s testimony, the motion in limine, we hold that the trial court did not abuse its discretion by admitting Fitzgerald’s testimony.  We overrule WBI’s first cross-issue.

Legal Sufficiency

In its second cross-issue, WBI argues that there is no evidence to support the jury’s finding that the May 1997 drawing was “rigged.”  We disagree.  
A legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.
(footnote: 59)  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and disregard evidence contrary to the finding unless a reasonable factfinder could not.
(footnote: 60)  Anything more than a scintilla of evidence is legally sufficient to support the finding.
(footnote: 61)
 WBI argues that the only direct evidence of the manner in which the drawing was conducted is Sharp’s testimony and that no other direct evidence was presented to contradict his testimony.  Circumstantial evidence, however, was presented to contradict Sharp’s testimony.

In this case, the record reflects that Cotten’s family had held shares in the Bank since 1902.  Cotten had served on the board of the Bank and WBI.  When Sharp was looking into purchasing a majority of the common shares in Parker County Bancshares, the top-tier parent holding company, Sharp came to Cotten to get access to Bank records.  Cotten declined to help because he thought it was a “shady deal,” and he told Sharp that he would have a lawsuit on his hands if he tried to take over the bank.  Sharp, however, decided to purchase the shares of stock, which gave him control of a majority of the shares.  Both Cotten and Sharp testified that this interaction began the conflict between them.

Incumbent management at the time of the sale resisted Sharp’s efforts to acquire control, and a group of shareholders filed suit against Sharp to stop the acquisition.  Cotten did not join the suit, but he sympathized with the cause and gave the shareholders $5,000 to help pay for legal fees.  Sharp thought the suit was “totally bogus,” and after the unsuccessful suit ended, he decided that he needed to get rid of all the people who had sued him.

Sharp began purchasing additional common shares from individuals for $114-$117 per share.  Sharp offered Cotten $117 per share, but Cotten would not sell because he thought the stock was worth a lot more than $117.  Because Cotten, Cotten’s sister, and two other small shareholders refused to voluntarily sell their stock to Sharp, Sharp adopted a plan of merger that required the shareholders to sell their common stock for $117.

Cotten refused the merger price and brought suit to enforce his right under articles 5.11 and 5.12 of the Texas Business Corporation Act to receive full fair value for his shares.
(footnote: 62)  A court-appointed appraiser determined the fair value of the stock was $250 per share.  Settlement was reached in the suit and Sharp paid $280 per share to resolve all claims.  Although Sharp acquired Cotten’s Parker County Bancshares common shares after the merger, Cotten still retained his WBI preferred shares.

Because the WBI preferred shares were still outstanding, the preferred shareholders continued to expect Sharp to pay dividends.  When no dividend was paid at the end of the first quarter after Sharp acquired control, shareholders began to question whether dividends were going to be paid.  Cotten, on behalf of himself and other shareholders, asked Sharp why the dividends had not been paid.  Sharp said that there was not going to be a dividend because he had the authority to spend the money as he saw fit, and he was using the money to buy a bank in Munday, Texas.  Sharp viewed Cotten as an agitant, and he believed that he had to get rid of him and his sister.

Sharp then began to comment on his plans to redeem preferred shares. Tellers at the bank who held one, two, or three preferred shares were approached about turning in their shares and getting paid for them if they would invest in a retirement plan that Statham was selling.  Sharp and two other men were present when Cotten was informed that this “offer” had been made to the tellers.  Cotten stated that there was no way that those people could turn in their shares and be paid because the only way those shares could be redeemed was by lot, by drawing out the shares, or by paying every preferred shareholder off, too.  Agitated at Cotten’s statement, Sharp “huffed off and walked off.” Sharp testified that he wanted to get rid of Cotten and his family.  The Cotten family made comments at the Bank’s shareholders meetings, so Sharp needed to get rid of the problem.

Shortly thereafter, Cotten received a letter from Sharp and Statham informing him that WBI had “elected to redeem” his WBI preferred shares. Cotten’s, his sister’s, and his nephew’s preferred shares were the only preferred shares elected for redemption.  There was not a drawing of preferred shares by lot or pro rata; Sharp admitted that he just redeemed the Cotten family’s preferred shares to get rid of them.

Although Cotten had received the letter stating that his shares had been redeemed, he did not act on the redemption demand.  Cotten did not believe that the redemption was valid because Sharp and Statham had not followed the redemption procedure set out in the Articles.  Cotten told Sharp that his shares were not redeemed properly because redemption had to be pro rata or by lot. Although the redemption was never rescinded, Sharp and Statham did not enforce it.

In March or April 1997, while reviewing public reports by WBI to the Federal Reserve Bank, Cotten noticed a reduction of about $16,000 in WBI capital stock.  By letter, Cotten then requested to review WBI records that would reflect the reason for the $16,000 reduction.  Cotten was allowed access to some of the records, and he found that WBI’s transfer ledger stated Parker County Bancshares’s preferred shares had been “redeemed by WBI per Joe Sharp–paid $15,808.”  Sharp owns the majority common stock in and serves on the board of Parker County Bancshares.  Although Sharp would not tell Cotten what was going on at the time he noticed the reduction in capital stock, Sharp testified that the $15,808 went to Parker County Bancshares and then went to First Baird Bancshares, Inc., which Sharp’s family also controls. 

In 1997, the corporate structure was also changed.  First Baird Bancshares became the top-tier parent holding company, owning 100% of First Baird Bancshares of Delaware, Inc., which in turn owned 97.3 % of First National Bank of Baird and 94.76% of WBI, which in turn owned 100% of First Weatherford Bancshares, Inc., which in turn owned 99.3% of the Bank and 80.75% of First Munday Bancshares, Inc., which in turn owned 100% of First Munday Bancshares of Delaware, Inc., which in turn owned 100% of First National Bank of Munday.  Each holding company was controlled by Sharp and each company’s sole assets were the stock of the subsidiary directly below it. Thus, the only time any of the holding companies had cash was when dividends were paid.  Consequently, the Bank’s cash is the only cash all the holding companies rely on.

After reviewing the records in April and early May 1997, Cotten requested copies of certain documents.  A few days later, Cotten sent a letter to Sharp following up on the request for the copies.  Sharp responded in a letter stating that he would not allow copies of the documents.

Three days later, on May 15, 1997, Sharp and Statham secretly conducted what they characterized as a random drawing of the seventy-nine preferred shareholders for redemption of the shareholder’s shares.  Cotten’s name was one of only seven names drawn by Sharp and Statham at this secret drawing.  Cotten’s 874 shares represented two-thirds of the shares redeemed.  Cotten was then sent a letter that said that Sharp and Statham had decided to conduct the first random drawing ever held by WBI to redeem “up to 1,200 but not more than 1,500 shares of the Corporation’s preferred stock,” and that his preferred shares had been redeemed.

Prior to this drawing, no notice had been given of Sharp and Statham’s redemption plan, nor were there any corporate board meeting minutes prior to or after the drawing reflecting Sharp and Statham’s redemption plan.  Because it was widely known that Cotten and Sharp had animosity toward each other and that on many occasions Sharp had stated that he wanted Cotten out of the picture, Rolanna Fitzgerald testified that “it was very coincidental that Mr. Cotten’s stock was drawn out of all the shareholders.”

Additionally, Sharp stated that Cotten’s inspection requests added to the  motivation for getting rid of him.  Following the redemption of Cotten’s preferred shares, Sharp refused Cotten any access to corporate records, in part because he was no longer a shareholder of WBI.

These facts show more than a scintilla of evidence that the drawing was rigged.  Because the jury had the advantage of not only hearing the testimony, but also seeing the witnesses and all the surrounding circumstances that play a part of the process of determining credibility, we defer to the jury on credibility of the witnesses.
(footnote: 63)  Furthermore, in fraud claims, such as the rigged drawing in this case, motive, past conduct, and related wrongful acts are factors considered because fraud is usually not discernible by direct evidence and is usually so covert or attendant with such attempts at concealment as to be incapable of proof other than by circumstantial evidence.
(footnote: 64)  Even if comments about getting rid of Cotten were made “in jest,” as WBI, Sharp, and Statham argue, they could be properly considered as circumstantial evidence.  Consequently, the evidence is legally sufficient to support the jury’s finding that the May 1997 drawing was “rigged.”  We overrule WBI’s second cross-issue.

Mitigation

WBI also argues in its third and fourth cross-issues that the trial court erred by finding that Cotten did not fail to mitigate his damages and by not reducing the damage award by the amount that Cotten failed to mitigate his damages.  Cotten argues that these issues have been waived.  We agree. A party asserting an affirmative defense, such as mitigation, in a trial before the court must request findings in support thereof to avoid waiver.
(footnote: 65)  If the findings filed by the trial court do not include any element of the defense asserted, then the party’s failure to make a timely request for additional findings relevant thereto is a waiver of the right to complain on appeal of the court’s lack of such findings.
(footnote: 66)
 The mitigation of damages doctrine requires the injured party to exercise reasonable care to minimize its damages if damages can be avoided with only slight expense and reasonable effort.
(footnote: 67)  The party asserting failure to mitigate has the burden of proving facts showing lack of such mitigation and must also show the amount by which the damages were increased by failure to mitigate.
(footnote: 68) In this case, WBI submitted proposed findings of fact and conclusions of law one month before the trial court filed its findings of fact and conclusions of law.  In its proposed findings of fact, WBI requested the court to find:

4. At the time of the 1997 redemption, WBI deposited the price for the redeemed shares ($92,370.26) into a bank account for Plaintiff’s benefit.

5.   The $92,370.26 deposited by WBI for Plaintiff from the 1997 redemption was always available to Plaintiff.

6.   Plaintiff did not withdraw, and did not attempt to withdraw, any portion of the $92,370.26 deposited for Plaintiff from the 1997 redemption.

The trial court signed findings of fact on November 23, 2003 that, in the most relevant portion, stated:

9.   At the time of the 1997 redemption, [WBI] deposited $92,370.26 into a bank account for Plaintiff’s benefit.

. . . . 

11.   Plaintiff did not withdraw the $92,370.26 with respect to his 874 preferred shares nor surrendered his stock certificates.

The trial court’s findings of fact and conclusions of law do not include any  element of mitigation.  Following the trial court’s filing of its findings of fact and conclusions of law, WBI did not object or request additional findings.  Consequently, WBI has waived its third and fourth cross-issues, and we overrule them.

Attorney’s Fees

Finally, in WBI’s fifth and sixth cross-issues, it alleges that the trial court erred by awarding attorney’s fees to Cotten and failing to award attorney’s fees to WBI.  We disagree with WBI.

In a declaratory judgment proceeding, the trial “court may award . . . reasonable and necessary attorney’s fees as are equitable and just.”
(footnote: 69)  The grant or denial of attorney’s fees in a declaratory judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused its discretion.
(footnote: 70)  A trial court abuses its discretion when it acts without reference to any guiding rules or principles or rules without supporting evidence.
(footnote: 71)
 In this case, WBI only challenges whether the fees were equitable and just.  We find no evidence in the record to indicate that the trial court’s attorney’s fees award was inequitable or unjust, and there is some evidence to support it.  At trial, Cotten prevailed on his illegal redemption declaratory judgment claim.  The testimony at trial shows that Cotten accrued $64,125 in attorney’s fees, 75% of which were attributable to the redemption declaratory judgment claim.  Additionally, the record shows that $2,425.99 in trial expenses accrued.  The jury awarded Cotten $75,000 for reasonable and necessary attorney’s fees.  In its final judgment the trial court reduced the attorney’s fees award to $50,519.74 for preparation and trial.  This amount appears to be $48,093.75, which is 75% of the $64,125 total attorney’s fees accrued and attributable to the redemption declaratory judgment claim, plus $2,425.99 for trial expenses.  Such a calculation was appropriate.  When a party seeks to recover attorney’s fees in a case involving multiple claims, one of which he prevailed on and others of which he did not, the party must offer evidence segregating attorney’s fees among the various claims.
(footnote: 72)  An exception to this duty to segregate arises when the attorney’s fees are in connection with claims arising out of the same transaction and are so interrelated that their prosecution entails proof of essentially the same facts.
(footnote: 73)  Whether fees can be segregated between various claims is a question for the court.
(footnote: 74)  Here, Cotten’s counsel himself testified that he was able to segregate the percentage of time allocated to the different causes of action.  He did not argue that the claims were so interrelated that their prosecution entails proof of essentially the same facts.  Because we believe this is not a case of such  interrelation, we hold that the trial court’s allocation of fees attributable to the prevailing claim—the redemption declaratory judgment claim—was proper.  We therefore conclude that Cotten is entitled to those fees attributable to the prosecution of his redemption declaratory judgment claim and, therefore, that the trial court was correct in awarding this amount.

Because Cotten prevailed on his redemption declaratory judgment claim and the trial court reduced the jury’s attorney’s fees award to reflect the amount shown by the evidence, we hold that the trial court did not abuse its discretion by awarding Cotten attorney’s fees.  We overrule WBI’s fifth cross-issue.

Additionally, we find no evidence in the record to indicate that the trial court’s denial of an attorney’s fees award to WBI was inequitable or unjust, and there is also some evidence to support the denial.  At trial, Cotten prevailed in his redemption declaratory judgment claim against WBI.  WBI was granted a directed verdict on Cotten’s inspection claim, and, as set forth above, we held that the trial court erred by granting that motion.  Furthermore, the jury specifically awarded WBI no attorney’s fees.  Therefore, we hold that the trial court did not abuse its discretion by denying WBI attorney’s fees.  We overrule WBI’s sixth cross-issue.

Conclusion

We reverse the part of the trial court’s judgment rendering judgment as a matter of law on and dismissing Cotten’s inspection claim against WBI and his oppression and conspiracy claims against Sharp and Statham.  We remand those three claims for trial.

We modify the trial court’s judgment to delete the finding that Cotten remained a preferred shareholder of WBI through the date on which all outstanding preferred shares were redeemed, January 7, 2002, and to insert the finding and order that Cotten remains a preferred shareholder entitled to have and recover from WBI preferred dividends until his shares are properly redeemed.  

We affirm the trial court’s calculation of preferred dividends due Cotten from April 1, 1997 through January 7, 2002, but we reverse and remand the case to the trial court for calculation of additional preferred dividends due Cotten from January 8, 2002 to the date of the trial court’s judgment and for recalculation of prejudgment interest in accordance with this opinion.

We affirm the remainder of the trial court’s judgment.

LEE ANN DAUPHINOT

JUSTICE

PANEL A: CAYCE, C.J., DAUPHINOT, J., and JOHN T. BOYD, J. (Retired, Sitting by Assignment).

CAYCE, C.J. concurs in part and dissents in part without opinion.  He would affirm the trial court’s judgment in its entirety.

DELIVERED:  February 9, 2006

FOOTNOTES
1:
See
 
Tex. Bus. Corp. Act. Ann. 
art. 2.44, § C (Vernon Supp. 2005).

2:
See Prudential Ins. Co. v. Fin. Review Servs., Inc.
, 29 S.W.3d 74, 77 (Tex. 2000); 
Ray v. McFarland,
 97 S.W.3d 728, 730 (Tex. App.—Fort Worth 2003, no pet.). 

3:
See City of Keller v. Wilson
, 168 S.W.3d 802, 827 (Tex. 2005).

4:
Coastal Transport Co. v. Crown Cent. Petroleum Corp
., 136 S.W.3d 227, 234 (Tex. 2004)
.

5:
Szczepanik v. First S. Trust Co.,
 883 S.W.2d 648, 649 (Tex. 1994).  

6:
Tex. Bus. Corp. Act. Ann. 
art. 2.44, § C.

7:
Martin v. Martin
,
 Martin
,
 & Richards
,
 Inc.
, 12 S.W.3d 120, 124 (Tex. App.—Fort Worth 1999, no pet.).

8:
Black’s Law Dictionary
 623 (8th ed. 2004).

9:
Id
. at 591.

10:
Webster’s Ninth New Collegiate Dictionary
 440 (9th ed. 1983).

11:
See Fitzgerald v. Advanced Spine Fixation Sys.
,
 Inc.
, 996 S.W.2d 864, 865–66 (Tex. 1999) (stating that a court construes a statute “first, by looking to the plain and common meaning of the statute’s words”).

12:
Grinnell v. Munson
, 137 S.W.3d 706, 718 (Tex. App.—San Antonio 2004, no pet.); 
In re Estate of Fawcett
, 55 S.W.3d 214, 220 (Tex. App.—Eastland 2001, pet. denied); 
Faour v. Faour
, 789 S.W.2d 620, 622–23 (Tex. App.—Texarkana 1990, writ denied); 
see also Hoggett v. Brown
, 971 S.W.2d 472, 488 n.13 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (noting that “in certain limited circumstances, a majority shareholder who dominates control over the business may owe such a duty to the minority shareholder”).

13:
Grinnell
, 137 S.W.3d at 718.

14:
Hoggett
, 971 S.W.2d at 488; 
see also Myer v. Cuevas
, 119 S.W.3d 830, 836 (Tex. App.—San Antonio 2003, no pet.).

15:
Fawcett
,
 
55 S.W.3d at 220.

16:
Hubbard v. Shankle
, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied).

17:
Hogget
, 971 S.W.2d at 488.

18:
Id
.

19:
Hubbard
, 138 S.W.3d at 483.

20:
Hogget
, 971 S.W.2d at 488.

21:
See DeBord v. Circle Y of Yoakum
,
 Inc.
, 951 S.W.2d 127, 133 (Tex. App.—Corpus Christi 1997), 
rev’d on other grounds
, 
Stary v. DeBord
, 967 S.W.2d 352 (Tex. 1998).

22:
Schlueter v. Carey
, 112 S.W.3d 164, 169 (Tex. App.—Fort Worth 2003, pet. denied)

23:
See id
. at 169–70.

24:
Lawrence E. Michell, 
The Puzzling Paradox of Preferred Stock (And Why We Should Care About It)
, 51 
Bus. Law
. 443, 445–50 (1996).

25:
See
,
 e.g.
, 
Eisenberg v. Chicago Milwaukee Corp.
, 537 A.2d 1051, 1060–61 & n.13 (Del. Ch. 1987);
 Rothschild Int’l Corp. v. Liggett Group Inc.
, 474 A.2d 133, 136 (Del. 1984); 
Judah v. Del. Trust Co.
, 378 A.2d 624, 628 (Del. 1977).

26:
Prudential Ins. Co.
, 29 S.W.3d at 77
;
 Ray
, 97 S.W.3d at 730.

27:
Pinnacle Data Servs.
,
 Inc. v. Gillen
, 104 S.W.3d 188, 196 (Tex. App.—Texarkana 2003, no pet.) (emphasis added); 
Willis v. Bydalek
, 997 S.W.2d 798, 801 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

28:
Black’s Law Dictionary
 1127.

29:
See
 Eric J. Gouvin, 
Of Hungry Wolves And Horizontal Conflicts: Rethinking the Justifications for Bank Holding Company Liability
, 1999 
U. Ill. L. Rev. 
949, 989–90 (1999).

30:
See Michell
, note 25, at 450; 
Gouvin
, note 30, at 989-90.

31:
See
 
Gouvin
, note 30, at 989-90.

32:
Michell
, note 25, at 450; 
Gouvin
, note 30, at 989-90.

33:
Gouvin
, note 30, at 991.

34:
See Pinnacle Data Servs.
, 104 S.W.3d at 196; 
Willis
, 997 S.W.2d at 801.

35:
See Prudential Ins. Co.
, 29 S.W.3d at 77; 
Ray,
 97 S.W.3d at 730.

36:
Operation Rescue Nat’l v. Planned Parenthood
, 975 S.W.2d 546, 553 (Tex. 1998); 
Morris v. JTM Materials
,
 Inc.
, 78 S.W.3d 28, 55 (Tex. App.—Fort Worth 2002, no pet.).

37:
See
 
Operation Rescue
, 975 S.W.2d at 553; 
Morris
, 78 S.W.3d at 55.

38:
See
 
In re Arthur Andersen
, 121 S.W.3d 471, 482 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding).

39:
Id
.

40:
Pabich v. Kellar
, 71 S.W.3d 500, 508 (Tex. App.—Fort Worth 2002,  pet. denied).

41:
Portlock v. Perry
, 852 S.W.2d 578, 582 (Tex. App.—Dallas 1993, writ denied).

42:
Kirby v. Cruce
, 688 S.W.2d 161, 166 (Tex. App.—Dallas 1985, writ ref’d n.r.e.) (quoting 
Kinzbach Tool Co. Inc. v. Corbett-Wallace Corp
., 160 S.W.2d 509, 514 (Tex. 1942)).

43:
Arthur Andersen
, 121 S.W.3d at 481–82.

44:
Tex. R. Civ. P.
 166a(i).

45:
Id.; Johnson v. Brewer & Pritchard
,
 P.C.
,
 
73 S.W.3d 193, 207 (Tex. 2002).

46:
See
 
Tex. R. Civ. P.
 166a(i) & cmt.; 
S.W. Elec. Power Co. v. Grant
, 73 S.W.3d 211, 215 (Tex. 2002).

47:
King Ranch
,
 Inc. v. Chapman
, 118 S.W.3d 742, 751 (Tex. 2003), 
cert. denied
, 124 S. Ct. 2097 (2004); 
Johnson
, 73 S.W.3d at 197; 
Morgan v. Anthony
, 27 S.W.3d 928, 929 (Tex. 2000).

48:
Moore v. K Mart Corp.
, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied).

49:
Flanary v. Mills
, 150 S.W.3d 785, 795 (Tex. App.—Austin 2004, pet. denied).

50:
Id
.

51:
Id
.

52:
Ernst & Young
,
 L.L.P. v. Pac. Mut. Life Ins. Co.
, 51 S.W.3d 573, 577 (Tex. 2001); 
Hubbard
, 138 S.W.3d at 482–83.

53:
Flanary
, 150 S.W.3d at 795.

54:
Hubbard
, 138 S.W.3d at 483; 
Fawcett
, 55 S.W.3d at 218.

55:
18 
Am. Jur. 2d 
Corporations
 § 456 (2004); 
Hay v. Big Bend Land Co.
, 204 P.2d 488 (Wash. 1949);(citing 
Thompson v. Fairleigh
, 187 S.W.2d 812 (Ky. 1945).

56:
Id
.

57:
See
 
Tex. R. App. P.
 47.1.

58:
See Aetna Cas. & Sur. Co. v. Specia
, 849 S.W.2d 805, 807 (Tex. 1993) (applying former Rule 215(5)).

59:
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
"No Evidence"
 
and "Insufficient Evidence" Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960)
.

60:
City of Keller v. Wilson
, 168 S.W.3d 802, 827 (Tex. 2005). 

61:
Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996); 
Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).

62:
See
 
Tex. Bus. Corp. Act Ann.
 art. 5.11–.12 (Vernon Supp. 2005).

63:
See Gunn Buick
,
 Inc. v. Rosano
, 907 S.W.2d 628, 631 (Tex. App.—San Antonio 1995, no writ).

64:
Morgan v. Arnold
, 441 S.W.2d 897, 903–04 (Tex. App.—Dallas 1969, writ ref’d n.r.e.).

65:
See
,
 e.g.
, 
Alma Invs.
,
 Inc. v. Bahia Mar Co-Owners Ass’n
, 999 S.W.2d 820, 822 (Tex. App.—Corpus Christi 1999, pet. denied); 
Harry Hines Med. Ctr.
,
 Ltd. v. Wilson
, 656 S.W.2d 598, 602 (Tex. App.—Dallas 1983, no writ). 

66:
See
,
 e.g.
, 
Tex. R. Civ. P.
 298; 
Alma Invs.
, 999 S.W.2d at 822; 
Robles v. Robles
, 965 S.W.2d 605, 611 (Tex. App.—Houston [1st Dist.] 1998, writ denied); 
Wilson
, 656 S.W.2d at 602.

67:
Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1, 
908 S.W.2d 415, 426 (Tex. 1995); 
Taylor Foundry Co. v. Wichita Falls Grain Co.
, 51 S.W.3d 766, 774 (Tex. App.—Fort Worth 2001, no pet.); 
Harris County v. Smoker
, 934 S.W.2d 714, 721 (Tex. App.—Houston [1st
 Dist.] 1996, writ denied).

68:
Lester v. Logan
, 893 S.W.2d 570, 577 (Tex. App.—Corpus Christi 1994), 
writ denied per curiam
, 907 S.W.2d 452 (Tex. 1995)
; 
Rauscher Pierce Refsnes, Inc. v. Great S.W. Sav. F.A.
,
 
923 S.W.2d 112, 117 (Tex. App.—Houston [14th
 Dist.] 1996, no writ).

69:
Tex. Civ. Prac. & Rem. Code Ann.
 § 37.009 (Vernon 1997).

70:
Bocquet v. Herring
, 972 S.W.2d 19, 21 (Tex. 1998).

71:
Id
.

72:
Beard Family P’ship v. Commercial Indem., 
116 S.W.3d 839, 850 (Tex. App.—Austin 2003, no pet.).

73:
Stewart Title Guar. Co. v. Sterling
, 822 S.W.2d 1, 11 (Tex. 1991); 
Houston Livestock Show & Rodeo, Inc. v. Hamrick
, 125 S.W.3d 555, 585 (Tex. App.—Austin 2003, no pet.).

74:
Hamrick
, 125 S.W.3d at 585.