Opinion issued July 12, 2007











In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00188-CV






DYNACQ HEALTHCARE, INC. F/K/A DYNACQ INTERNATIONAL, INC.
AND THE CARTER LAWFIRM, Appellants


V.


PROMOD SETH, Appellee






On Appeal from the 280th District Court

Harris County, Texas

Trial Court Cause No. 2003-65441




 


MEMORANDUM OPINION

 Appellee Promod Seth sued appellant Dynacq HealthCare, Inc. f/k/a Dynacq
International, Inc. for breach of an employment agreement and a related stock option
agreement. The trial court rendered judgment on the jury's verdict that Seth recover
$53,000.00 for breach of the employment agreement, $173,688.00 for breach of the
stock option agreement, $60,850.00 in attorney's fees for trial, and $17,000.00 in
attorney's fees on appeal in this Court and the supreme court. The trial court also
sanctioned Dynacq and its attorneys, The Carter Lawfirm, $745.66 for discovery
abuse. In 13 issues, Dynacq challenges the sufficiency of the evidence and alleges
jury misconduct. In the remaining issue, Dynacq and its attorneys challenge the
discovery sanction. We modify the award of attorney's fees, and, as modified, affirm.

Discussion


 We first address Dynacq's challenges to the legal and factual sufficiency of the
evidence to support (1) damages for breach of the employment and stock option
agreements and (2) attorney's fees. Because this is a memorandum opinion and the
parties are familiar with the factual background, we will discuss the facts only as they
relate to our sufficiency review.

Sufficiency of the evidence

 Standard of review

 Dynacq challenges the jury's verdict for both legal and factual sufficiency.
When Dynacq attacks the legal sufficiency of an adverse finding on an issue for
which it did not have the burden of proof, Dynacq must demonstrate that there is no
evidence to support the adverse finding. See Croucher v. Croucher, 660 S.W.2d 55,
58 (Tex. 1983). Such a no-evidence challenge will be sustained when "'(a) there is
a complete absence of evidence of a vital fact, (b) the court is barred by rules of law
or of evidence from giving weight to the only evidence offered to prove a vital fact,
(c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d)
the evidence conclusively establishes the opposite of the vital fact.'" King Ranch,
Inc. v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003) (quoting Merrell Dow Pharms.,
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997)).

 To the extent that Dynacq challenges the legal sufficiency of the evidence that
Seth offered to prove a vital fact, "we must view the evidence in a light that tends to
support the finding of disputed fact and disregard all evidence and inferences to the
contrary." Wal-Mart Stores, Inc. v. Miller, 102 S.W.3d 706, 709 (Tex. 2003). 
However, "[t]he final test for legal sufficiency must always be whether the evidence
at trial would enable reasonable and fair-minded people to reach the verdict under
review. . . . [L]egal-sufficiency review in the proper light must credit favorable
evidence if reasonable jurors could, and disregard contrary evidence unless
reasonable jurors could not." City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005). The jury is the sole judge of witnesses' credibility; it may choose to believe
one witness over another, and a reviewing court cannot impose its own opinion to the
contrary. Id. at 819. Because it is the jury's province to resolve conflicting evidence,
we must assume that jurors resolved all conflicts in accordance with their verdict if
reasonable human beings could do so. Id.

 When Dynacq challenges the factual sufficiency of the evidence, this Court
must consider and weigh all the evidence and should set aside the judgment only if
it is so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust. Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); see also Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex.1986), overruled on other grounds by Crown
Life Ins. Co. v. Casteel, 22 S.W.3d 378, 388 (Tex. 2000); In re King's Estate, 244
S.W.2d 660, 661 (Tex. 1951). Dynacq also asks that this Court in issues six, ten, and
twelve to suggest a remittitur. A court of appeals may suggest a remittitur only if the
evidence is factually insufficient to support the amount awarded. Pope v. Moore, 711
S.W.2d 622, 624 (Tex. 1986).

 Breach of the employment agreement

 In issues one, two, and three, Dynacq argues there is legally and factually
insufficient evidence to support the jury's answer to question 1:

 Did Dynacq fail to comply with the employment agreement with
Plaintiff Promod Seth by terminating Plaintiff's employment without
cause?

 

 "Cause" means (a) dishonest, willful or fraudulent conduct in the
performance of his duties, (b) involvement with a transaction in
connection with the performance of his duties which transaction is
adverse to the Company's interest and which is engaged in for personal
profit, or (c) the willful violation of any law, rule or regulation in
connection with the performance of his duties (other than traffic
violations or similar offenses).


 Answer "Yes" or "No".


 Answer: YES 

The definition of "cause" in the charge is the definition in the employment agreement
between Dynacq and Seth.

 Dynacq argues that Seth did not perform or tender performance under the
contract, yet the charge did not ask the jury to decide this. Dynacq does not argue on
appeal that the trial court submitted an erroneous charge. We therefore review the
sufficiency of the evidence based on the court's charge, not against the question and
any instruction that should have been submitted. See Osterberg v. Peca, 12 S.W.3d
31, 55 (Tex. 2000).

 Seth received an August 22, 2002 letter from Irvin T. Gregory, Dynacq's chief
development officer, that referred to Seth's termination without any explanation
regarding cause. At trial, Gregory testified that Dynacq terminated Seth because
"Seth was no longer needed at the company. He wasn't going to take the CFO's job
and basically what he was hired to do was done." Gregory further testified that Seth
did not do any of the things that would constitute "cause" as defined in the
employment agreement.

 The deposition of Sarah Garvin, Dynacq's chief operating officer, was also
introduced at trial, in which Garvin gave conflicting testimony regarding whether
Seth was terminated for cause. Garvin initially said that Seth did not perform any acts
that would qualify as "cause" under the employment agreement. Garvin later
modified her testimony to say that she "could make an interpretation that there was
cause" to terminate Seth for "willful . . . conduct in the performance of his duties" if
she interpreted that to mean that Seth "chose not to be able - - or be able to provide
the number of hours and the intensity of work required for the roles being assigned
to him."

 There is some evidence in the record to support the jury's answer to question
1. The jury's answer is also not against the great weight and preponderance of the
evidence. We hold that the evidence is legally and factually sufficient and overrule
issues one, two, and three.

 Damages for breach of the employment agreement

 In issues four, five, and six, Dynacq argues there is legally and factually
insufficient evidence to support the jury's answer to question 2 and requests a
suggestion of remittitur:

 What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate Promod Seth for his damages, if any, that
resulted from Dynacq's termination of Promod Seth without cause?

 

 Consider the following elements of damages, if any, and none
other:

 

 (1) Lost earnings. "Lost earnings" equal the present cash value
of the employment agreement to the employee had it not been
breached, less amounts actually earned.

 

 Do not include in your answer any amount that you find Promod
Seth could have earned by exercising reasonable diligence in
seeking other employment.

 

 Do not add any amount for interest on damages, if any.

 

 Answer separately in dollars and cents for damages, if any, that -


 Were sustained in the past:

 Answer: $ 38,000.00

 In reasonable probability will be sustained in the future:

 Answer: $ 15,000.00

Under the employment agreement, Seth was to be paid a base salary of $500.00 to
$1,000.00 per month. Dynacq neither challenges that Seth's base salary was
$1,000.00 per month, nor does it challenge that the employment agreement was for
five years and Seth was terminated after seven months, leaving $43,000.00 in unpaid
salary. Instead, Dynacq argues that Seth had other sources of income; therefore, Seth
did not suffer any financial loss. Dynacq also argues that it conclusively proved that
Seth failed to mitigate his damages and that the damages were excessive.

 There is legally and factually sufficient evidence that Seth was not paid for the
remaining 43 months under the employment agreement at $1,000.00 per month. 
Dynacq does not point to any evidence in the record to show that Seth was precluded
under the employment agreement from receiving other income while working for
Dynacq. Any evidence in the record of Seth's other sources of income is therefore
not relevant in determining the sum of money that would fairly and reasonably
compensate Seth for damages resulting from Dynacq's terminating him without
cause. Regarding mitigation of damages, it was Dynacq's burden of proof to show
Seth's failure to mitigate. See Cotten v. Weatherford Bancshares, Inc., 187 S.W.3d
687, 708 (Tex. App.--Fort Worth 2006, pet. denied). The mitigation of damages
doctrine requires the injured party to exercise reasonable care to minimize its
damages if damages can be avoided with only slight expense and reasonable effort. 
Id. Dynacq points to evidence that Seth was in talks to purchase a car dealership in
Dallas or Rochester, but does not point to any evidence indicating that Seth could
start a car dealership with only slight expense and reasonable effort.

 We hold that the evidence for the jury's answer to question 2 is legally and
factually sufficient, and we overrule issues four, five, and six.



 Breach of the stock option agreement

 In issue seven, Dynacq argues there is legally and factually insufficient
evidence to support the jury's answer to question 3:

 Did Dynacq fail to comply with any written agreement with
Plaintiff by not allowing Plaintiff to exercise his stock options?

 

 Answer "Yes" or "No".


 Answer: YES 

As a part of Seth's employment agreement, Dynacq provided incentive stock options. 
Seth attempted to exercise this option by means of a cashless method through
Dynacq's broker, Merrill Lynch, but Dynacq's designated officer, Phillip Chan,
refused to sign the "notice of exercise of incentive stock options" forms that had been
completed by Seth. Chan testified at trial that over 50 Dynacq employees were
allowed to exercise cashless stock options.

 Dynacq's stock incentive plan provides the following method to acquire stock:


 Method of Exercise. The exercise of an Option shall be made only by
a written notice delivered in person or by mail to the Secretary of the
Company at the Company's principal executive office, specifying the
number of Shares to be purchased and accompanied by payment therefor
and otherwise in accordance with the Agreement pursuant to which the
Option was granted. The purchase price for any Shares purchased
pursuant to the exercise of an Option shall be paid, as determined by the
Committee in its discretion, in either of the following forms (or any
combination thereof): (i) cash or (ii) the transfer of Shares to the
Company upon such terms and conditions as determined by the
Committee. In addition, both Employee Options and Director Options
may be exercised through a registered broker-dealer pursuant to such
cashless exercise procedures (other than Share withholding) which are,
from time to time, deemed acceptable by the Committee . . . .

Dynacq International, Inc. Year-2000 Stock Incentive Plan ¶ 7.2 (emphasis added).

The stock option agreement between Dynacq and Seth provides the following:

 4. Exercise of Options. This Incentive Option shall be exercisable
during its term, subject to the provisions of the Plan, as follows:


 (a) Vesting. Of the Shares underlying the Incentive Option,
10,000 shares shall vest immediately, and the remaining 10,000 shares
shall vest on the first anniversary of the Date of Grant.


 (b) Right of Exercise. This Incentive Option is exercisable
at any time during the term of this Incentive Option Agreement, in
whole or in part, to acquire those Shares that have vested in accordance
with this Incentive Option Agreement; provided, however, that this
Incentive Option may only be exercisable to acquire whole shares of
Common Stock.


 (c) Method of Exercise. This Incentive Option is
exercisable by delivery to the attention of the Secretary of the Company,
no fewer than three business days prior to the proposed effective date of
the exercise of this Incentive Option Agreement, a written notice, signed
by the Optionee, specifying the number of Shares to be acquired on, and
the effective date of, such exercise.


 (d) Method of Payment. Payment of the Exercise Price for
the Shares purchased under this Incentive Option shall be delivered, by
certified mail to the attention of the Secretary of the Company, on the
effective date of exercise by any combination of the following: (i) cash;
(ii) certified check; (iii) bank cashier's check; (iv) wire transfer; or (v)
by any other method approved by the Committee or the Board of
Directors at their sole discretion.

Incentive Stock Option Agreement ¶ 4 (italicized emphasis added). Dynacq chose
Merrill Lynch, Pierce, Fenner & Smith Inc. to serve as broker for the employee stock
plan. Pursuant to an agreement between Dynacq and Merrill Lynch, Dynacq
employees were allowed to exercise their stock options through a "cashless" program
in which Merrill Lynch agreed to fund in advance an employee's exercise price and
any applicable taxes, then "sell enough shares to pay for the exercise price,
withholding taxes (if any), and applicable brokerage fees or commissions." See
Merrill Lynch, What Stock Options Mean for You--Stock Option Plan for:
Dynacq International (Jan. 2002). The agreement with Merrill Lynch was
approved by Dynacq and was used by more than 50 employees.

 Dynacq argues that it had "no obligation to treat Seth the same as any other
employee." There is no indication in the record that Dynacq did not approve any
other employee's request to exercise stock options by the cashless method, or that
Dynacq's role in approving the request was anything other than administratively
verifying to Merrill Lynch that the employee had stock options. Without citation to
any precedent or any other authority on contract interpretation, Dynacq asks this
Court to interpret the above-cited stock incentive plan and stock option agreement
provisions to mean that Dynacq may grant or withhold approval of an employee's
request to exercise stock options by the cashless method on a case-by-case basis and
at its sole discretion.

 Dynacq's construction of the incentive plan and stock option agreement would
lead to the unreasonable, inequitable, and oppressive result that Dynacq could refuse
to approve Seth's request to exercise his stock options "just because." We do not
construe contracts in this manner. See Frost Nat'l Bank v. L & F Distribs., Ltd., 165
S.W.3d 310, 311-12 (Tex. 2005). We hold that the evidence for the jury's answer to
question 3 is legally and factually sufficient, and we overrule issue seven.

 Damages for breach of the stock option agreement

 In issues eight, nine, and ten, Dynacq challenges the legal and factual
sufficiency of question 4 and requests a suggestion of remittitur:

 What sum of money, if any, if paid now in cash, would fairly and
reasonably compensate Promod Seth for his damages, if any, that
resulted from such failure to comply?

 

 Consider the following element of damages, if any, and none
other.

 

 The amount of profit, if any, that Plaintiff lost due to
Dynacq's failure to allow the cashless exercise of
Plaintiffs' [sic] stock option at the closing price on August
22, 2002. 


 Do not include any amount of damages that Plaintiff could have
avoided by exercising reasonable care.

 

 Do not add any amount for interest on damages, if any.

 

 Answer in dollars and cents for damages, if any:

 

 Answer: $ 173,688.00

Dynacq does not challenge the calculation of amount of damages, but instead claims
the verdict is not supported by legally and factually sufficient evidence because
Dynacq did not fail to comply with the stock option agreement. We have previously
rejected this argument.

 Dynacq next claims that Seth had a duty to mitigate his damages by exercising
his stock option by a method other than the cashless method. There is a duty to
mitigate damages resulting from a breach of contract when the party can save himself
from the damages "at a trifling expense or with reasonable exertions." Great Am. Ins.
Co. v. N. Austin Mun. Util. Dist. No. 1, 908 S.W.2d 415, 426 (Tex. 1995). The duty
to mitigate, however, does not require an aggrieved party to accede to a wrongful
demand by the wrongdoer even if accession would minimize damages. See Sw. Gas
& Elec. Co. v. Stanley, 45 S.W.2d 671, 673-74 (Tex. Civ. App.--Texarkana 1931),
aff'd, 70 S.W.2d 413 (Tex. 1934); 11 Joseph M. Perillo, Corbin on Contracts
§ 57.15 (rev. ed. 2005). Put another way, a party's duty to mitigate damages does not
require that it sacrifice its contractual rights. See Tex. Gas Exploration Corp. v.
Broughton Offshore Ltd. II, 790 S.W.2d 781, 789 (Tex. App.--Houston [14th Dist.]
1990, no writ); 49 David R. Dow & Craig Smyser, Texas Practice: Contract
Law § 10.6 (2005). 

 We hold that the evidence for the jury's answer to question 4 is legally and
factually sufficient, and we overrule issues eight, nine, and ten.

 Attorney's fees

 In issues eleven and twelve, Dynacq challenges the legal and factual
sufficiency of a portion of question 5 and requests a suggestion of remittitur:

 What is a reasonable fee for the necessary services of Promod
Seth's attorney in this case, stated in dollars and cents?

 

 Answer with an amount for each of the following:

 

 a. For preparation and trial.


 Answer: $ 60,850


 b. For an appeal to the Court of Appeals.


 Answer: $ 12,000


 c. For an appeal to the Supreme Court of Texas.


 Answer: $ 5,000


Dynacq challenges the jury's award of $60,850.00 for preparation and trial, but not
the $17,000.00 in appellate attorney's fees.

 Seth's attorney testified that the reasonable and necessary attorney's fees
reflected in a September 9, 2005 invoice were $34,239.42. Trial commenced on
October 20, 2005. Seth's attorney also testified that his hourly billing rate was
$190.00 and that "I've spent easily 40 hours on this file since September 9th, 2005,
and that just has not been invoiced to Mr. Seth."

 Dynacq did not contest the reasonableness of (1) the attorney's hourly billing
rate of $190.00, (2) the amount of $34,239.42 for work performed through September
9, 2005, or (3) the estimate of an additional 40 hours since September 9, 2005. See
generally Arthur Anderson & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex.
1997) (discussing factors that factfinder could consider in determining reasonableness
of attorney's fees). The record, therefore, contains uncontested evidence of attorney's
fees of $41,839.42 ($34,239.42 + ($190.00 × 40)) for preparation and trial.

 We hold there is legally and factually sufficient evidence of $41,839.42 in
attorney's fees for preparation and trial. We further hold there is no evidence of the
balance of $19,001.58 in attorney's fees. Accordingly, we sustain the portion of issue
eleven relating to legal sufficiency, do not reach the remaining portion of issue eleven
regarding factual sufficiency, and do not reach issue twelve regarding a suggestion
of remittitur.

Jury misconduct

 In issue thirteen, Dynacq complains of two instances of alleged jury
misconduct. In the first instance, one of the jurors recognized Seth during Seth's
direct examination. The juror informed the bailiff, and at a break in the testimony the
trial court questioned the juror outside the presence of the jury. Dynacq moved for
a mistrial, but Seth suggested that the juror be excused and that the case proceed with
11 jurors. Dynacq did not object to proceeding with 11 jurors and the trial court
dismissed the juror. Any error regarding the dismissed juror has been waived. See
Tex. R. App. P. 33.1.

 In the second instance, the bailiff overheard some of the jurors speaking with
a witness about the cost of parking for Astros baseball games and about a cooler that
another juror brought to court. Although the bailiff did not see it, the jurors also gave
the witness a bottle of water. The trial court stated,

 I believe what the bailiff says about what the conversation was
about. I do not think that there was anything said about the case. It is
still highly improper to talk to the witness or to give the witness a bottle
of water. At the very least, I would reread to the jury their instructions
and call their attention to their instructions. So, for now, I'm going to
deny the motion for mistrial.

 To warrant a new trial for jury misconduct, the movant must establish that (1)
the misconduct occurred, (2) it was material, and (3) it probably caused injury. 
Golden Eagle Archery, Inc. v. Jackson, 24 S.W.3d 362, 372 (Tex. 2000). The first
element, misconduct, clearly occurred. See Tex. R. Civ. P. 226a instruction I, ¶¶ 1,
2 (instructing jurors not to mingle or talk with witnesses and not to give refreshments
to witnesses). However, the evidence does not establish that the misconduct was
material as it was not between a party and the jurors, did not concern the merits of the
case, and was witnessed in part by a neutral third party, the bailiff.

 Dynacq argues that the misconduct rises in effect to per se material injury,
analogizing to cases involving both party-juror and lawyer-juror contact. See, e.g.,
Tex. Milk Prods. Co. v. Birtcher, 157 S.W.2d 633, 633-34, 636 (Tex. 1941)
(reversing judgment when plaintiff purchased soft drink for juror during jury
deliberation). Dynacq also argues with vigor that we should look to the entire case
in determining material injury:

 Moreover, considering the record as a whole in this case, the
overall circumstances show that the jury was clearly motivated by
passion and prejudice in favor of Promod Seth. The amounts awarded
by the jury in damages to Seth completely ignored the overwhelming
majority of the evidence at trial that Seth did not perform the duties or
devote the time and effort required under his employment agreement,
did not tender the required payment for the issuance of his stock options,
did not meet the conditions precedent under his stock option agreement
to be entitled to issuance of the stock options, did not mitigate his
damages as required by law and provided no evidence to support the
jury's award of attorney's fees. The damages awarded by the jury in this
case are a prime example of a "runaway jury" motivated by nothing
more than passion and prejudice. There was absolutely no credible
evidence to support the amount of damages awarded by the jury to Seth
in this case in response to questions 2, 4, and 5. The damages awarded
by the jury were clearly excessive and manifestly unjust.

 The jury's actions in this case clearly showed an utter disregard
for the court's instructions, the facts, the law, the actual evidence
submitted, and the charge of the court. The jurors blatantly fraternized
with Seth's witnesses, exchanged favors with Seth's witnesses and
otherwise disregarded the actual evidence presented in support of the
parties' respective claims in this case. The cumulative effect of the
juror's conduct in this case and in their answers to the questions
submitted to them evidenced their bias and prejudice in favor of Seth
and clearly resulted in an unfair trial and manifest injustice.

We disagree with Dynacq's characterization of the jury's actions, and we overrule
issue thirteen.

Sanction Award

 In issue fourteen, Dynacq and The Carter Lawfirm contend the trial court
abused its discretion by sanctioning Dynacq and its attorneys, The Carter Lawfirm,
in the amount of $745.66 for discovery abuse. (1) The trial court imposed the sanction
to reimburse Seth for the cost of editing out approximately 100 objections during a
videotaped deposition so that the deposition could be presented to the jury. On
appeal, Dynacq and its attorneys object to the sanction because (1) the sanction
request was untimely and, therefore, waived, (2) the sanction request was oral, rather
than written, (3) there is no evidence to support the sanction award, and (4) Dynacq
and its attorneys were not given proper notice and allowed time to respond. At trial,
Dynacq's attorney objected to the sanction award as follows: "I never saw a motion
for sanctions, never had an opportunity to make a response for sanctions." 
Accordingly, the only error which is preserved is whether a sanction request must be
in writing and whether Dynacq and its attorneys had an opportunity to respond. See
Tex. R. App. P. 33.1.

 Seth's attorney orally moved for a sanction during trial on October 24, 2005:

 [SETH'S ATTORNEY]: I've got to just on the record, I've got to
move for sanctions against defendants for these objections because I've
been told that it cost my client $800 to cut over a hundred objections in
order to get this tape in a form to present to the jury. I move for
sanctions against defendants for the objections which caused my client
to have to incur and it's probably -- could affect the integrity of the tape
itself.

 THE COURT: I do agree that --

 [SETH'S ATTORNEY]: And we do have the -- we have the bill
from the video cutter for $745 which is the most I've ever seen to get the
videotape cut and it's due to having to edit out 100 objections.

 THE COURT: Okay. The --

 [DYNACQ'S ATTORNEY]: Your Honor, I made all those
objections in good faith. That's all I can say. I -- I --.

 THE COURT: Okay. I do agree that most of the objections don't
fit but I'm going to give it some more thought.

 So no ruling on that yet. You can bring it up later if you want to.

On October 27, 2005, after the trial concluded and the jury was excused, 

 THE COURT: I have made a decision with regard to the issue that
plaintiff had brought up earlier with regard to the -- and I forget how
much you're asking for.

 [SETH'S ATTORNEY]: 748.

 THE COURT: Well, I have concluded that the number of the
objections is sanctionable in this case and that defendant should pay to
plaintiff a sanction of $748. (2) Now I would think that this would be a
sanction, not that the lawyer would pay, if the lawyer wants to contest
that, and hold a hearing as to whether it's the lawyer or the lawyer's
client or who should pay that, you can have that hearing.

 I know you're disappointed about that.

 [DYNACQ'S ATTORNEY]: No, it was me, Your Honor, and I am
quite disappointed about that. I didn't really -- I never saw a motion for
sanctions, never had an opportunity to make a response for sanctions. 
I still stand on my position.

 THE COURT: Actually, I think I could impose this without any
motion at all, but I want to excuse you guys in case you want to catch
any jurors to talk to.

 Dynacq's attorney was present on October 24, 2005 when Seth moved for a
sanction. The only argument Dynacq made at that time was that all the objections
were made in good faith. Dynacq did not object based on the timing or form of the
motion. The trial court did not rule for three days. It is not credible for Dynacq and
its attorney to claim they had no opportunity to respond to the oral motion. Finally,
Dynacq and its attorney cite no authority for the proposition that the mere lack of a
written sanction motion precludes a sanction award, notwithstanding the fact that an
oral motion was made and nonmovant had notice and three days to respond. We
overrule issue fourteen.



 Conclusion


 We modify the trial court's judgment to reduce the award of attorney's fees
incurred and rendered for services through trial of the case from $60,850.00 to
$41,839.42. As so modified, we affirm. See Tex. R. App. P. 43.2(b). Finally, we
render judgment against the surety on Dynacq's supersedeas bond for (1) the
modified judgment against Dynacq and (2) the appellate costs taxed against Dynacq. 
See Tex. R. App. P. 43.5.




 Sam Nuchia 

 Justice

Panel consists of Justices Nuchia, Keyes, and Higley.
1. The December 2, 2005 written order sanctioned "The Carter LawFirm,"
rather than sanctioning Eric Carter individually. While we are aware that
attorneys--not law firms--represent clients, no one has challenged the sanction
award on that ground.
2. The trial court's December 2, 2005 written sanction order awarded
$745.66, not $748.00.