In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-09-00020-CV


______________________________




CAMMACK THE COOK, L.L.C., JASON CAMMACK,


LAUREN CAMMACK, AND MILTON CAMMACK, Appellants


V.



MARTA BEYEN EASTBURN, Appellee




 


On Appeal from the County Court at Law No. 2


Gregg County, Texas


Trial Court No. 2007-2609-CCL2




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 Cammack the Cook, L.L.C., Jason Cammack, Lauren Cammack, and Milton Cammack
(collectively referred to as the Cammacks) appeal from a trial court's summary judgment granted in
favor of Marta Beyen Eastburn. The Cammacks contend that the trial court misconstrued the parties'
lease agreement in granting Eastburn's motion for summary judgment and in denying the Cammacks'
partial motion for summary judgment. We affirm in part and reverse and remand in part for
adjudication of the Cammacks' remaining counterclaims. 

I. Factual and Procedural Background 

 Eastburn leased several rooms in her interior decorating store to the Cammacks for use as a
restaurant and catering facility. Despite the relatively short term of the lease, the Cammacks
extensively remodeled the property in order to convert it into a functioning restaurant. (1) The
remodeling took two months, cost between $60,000.00 to $70,000.00, and included changes made
to the concrete structure, and plumbing and electrical systems. A "gigantic," 1,500-gallon "grease
trap was put in the backyard using a crane." Holes were cut into: the ceiling and roof to attach
equipment for exhaust fans, the floor and tile to install several eight-by-eight-inch floor drains and
kitchen sinks emptying into the sewer system, and the walls to make space for gas and water pipes. 
Can lights were discarded and replaced with fluorescent lights, interior walls were removed and
replaced with new drywall covered with FRP, (2) and stainless steel was mounted or glued on the wall
behind the stove in order to shield it from heat. 

 The Cammacks were able to make timely rental payments for the first four months after the
renovations were complete. However, late rental payments began in January 2006 and continued
until August 2006. Exasperated with these late payments, Eastburn increased the Cammacks' initial
security deposit of $3,115.00 to $6,230.00. The additional deposit failed to deter the Cammacks
from making further late rental payments in September, October, and November 2006. 

 Pursuant to the lease, Eastburn immediately accelerated the due date of all rents. A written
notification of default, notice of acceleration, and demand for payment was sent to the Cammacks
on October 12, 2006. They did not comply with the notice, the lease was terminated, and Eastburn
claimed the Cammacks did not vacate the premises in a timely fashion. She filed a petition in county
court for breach of lease of the holdover provision, failure to make timely rental payments, and
failure to remove improvements and return the premises to its previous condition. Eastburn further
alleged the Cammacks left the property in a "filthy, deplorable condition," and, in violation of lease
terms, failed to remove alterations, decorations, and additions in order to return the premises to the
condition in which it previously existed. Included in the laundry list of complaints were: vents on
the roof which were not removed, holes in the roof, missing or damaged molding, damaged tile and
flooring, a damaged window, a grease trap in the backyard which had to be removed and required
the ground to be restored, plumbing and gas fixtures which should have been capped and covered,
abandoned items, and general failure to clean the premises.

 The Cammacks' answer denied holdover tenancy, arguing that the lease expired by its own
terms on July 30, 2007, that all kitchen renovations were completed with Eastburn's consent, that
they had no duty to restore the premises, and that some of the repairs requested were not authorized
by the lease. They also counterclaimed for return of the security deposit and alleged under
Chapter 92 of the Texas Property Code, which only applies to residential leases, that Eastburn was
retaliating against them for failure to repair air conditioning, despite the Cammacks' repeated
demands, and that they were entitled to attorney's fees. Tex. Prop. Code Ann. §§ 92.331-.333
(Vernon 2007). 

 The Cammacks next filed a motion for partial summary judgment arguing Eastburn had no
evidence to demonstrate they were holdover tenants. Also, since most of the work completed
included permanent changes to the structure, and "[l]ogic and reality dictates that these items cannot
be removed without damage to either the property, the building or the premises," the Cammacks
argued that the lease provisions did not require them to restore the premises as Eastburn demanded. 
Eastburn also filed a motion for summary judgment on her own claims, taking the obverse position. 
She provided bid proposals demonstrating that it would cost $19,155.00 to restore the premises and
$16,914.06 to remove the grease trap and fill the hole in the ground. She attached the deposition of
Jason Cammack, who testified no work was done to refurbish or restore the facility. He admitted
that the lease required the Cammacks to take FRP off the walls and clean the space and that neither
task was completed. Jason also admitted that he "had an obligation to remove all of my fixtures." 
Next, he described the condition in which the Cammacks left the property. Jason clarified cardboard
covered a large hole in the ceiling leading to the attic because the vent was removed, that gas and
water pipes were not capped and were visible in the wall, that an electrical conduit was coming out
of the floor, and that the stainless steel wall shield was not removed. Last, Jason testified the 1,500-
gallon grease trap still contained collections from the kitchen drains. 

 On December 5, 2008, the Cammacks filed amended counterclaims under Chapter 93 of the
Texas Property Code, which applies to commercial leases. They alleged Eastburn wrongfully
withheld the security deposit, wrongfully excluded them from the premises, and also alleged a cause
of action called "failure of consideration," seeking credit for the weeks of rent in which Eastburn
allegedly failed to repair the air conditioning. On December 19, they filed a "Response to Eastburn's
[Partial] Motion for Summary Judgment Motion to Renew the Cammacks' Motion for Partial
Summary Judgment." While the new counterclaims were briefly mentioned, no summary judgment
was sought on the counterclaims. (3) 

 The trial court considered the motions for summary judgment on December 30, 2008, and
rendered final judgment awarding Eastburn $36,069.06. Consistent with the affidavit of attorney's
fees and costs, the trial court awarded $19,945.00 in fees and $1,067.10 in costs. On appeal, the
Cammacks essentially argue, in a brief which challenges the reader, that the trial court erred because
the unambiguous lease agreement did not require them to remove improvements made to the
property and restore the premises and that Eastburn did not sufficiently prove damages and attorney's
fees. 

 The Cammacks also label the following as points of error: (1) "Appellants present an action
against appellee pursuant to Texas Property Code § 93.011"; (2) "Appellants present an action
against appellee pursuant to Texas Property Code § 93.002"; (3) "Appellants present a breach of
contract action against appellee and a defense of failure of consideration from appellee"; (4) "As a
matter of law, appellee is barred from pursuing any holdover claim against appellants. And the final
summary judgment denies appellee's holdover and cleaning claims, to which she fails to object"; and
(5) "Appellants' written objections, to appellee's motion for summary judgment and to her response
to appellants' motion for partial summary judgment, address matters that are not relevant, that do not
authorize summary judgment for appellee and which are not a defense to summary judgment against
her." At a minimum, "[a] complaint on appeal must address specific errors." Velasquez v. Waste
Connections, Inc., 169 S.W.3d 432, 439 (Tex. App.--El Paso 2005, no pet.); Hollifield v. Hollifield,
925 S.W.2d 153, 155 (Tex. App.--Austin 1996, no pet.). Because these statements, as well as the
corresponding portion of argument, fail to address specific errors made by the trial court, we overrule
these "points of error." 

II. Finality of the Summary Judgment 

 Typically, "[a]n order that adjudicates only the plaintiff's claims against the defendant does
not adjudicate a counterclaim, cross-claim, or third party claim." Lehmann v. Har-Con Corp., 39
S.W.3d 191, 205 (Tex. 2001). (4) Thus, before we address the merits of this appeal, we must determine
whether the trial court's summary judgment was final such that it "actually dispose[d] of every
pending claim and party or . . . clearly and unequivocally state[d] that it finally dispose[d] of all
claims and all parties." Id. "[T]he language of an order or judgment can make it final, even though
it should have been interlocutory, if that language expressly disposes of all claims and all parties." 
Id. at 200. "[I]ntent to finally dispose of the case must be unequivocally expressed in the words of
the order itself." Id. If that intent is clear from the order, then the order is final and appealable, even
though the record does not provide an adequate basis for rendition of judgment. Id. 

 Lehmann explained that a "statement like, 'This judgment finally disposes of all parties and
all claims and is appealable,' would leave no doubt about the court's intention." Id. at 206. The
summary judgment mirrors the Lehmann language, stating "[a]ll relief requested by any party in this
case that is not expressly granted by this judgment is denied. This judgment finally disposes of all
parties and claims in this action, is a final judgment, and is therefore appealable." In such a case,
where the language of the order suggests the court intended the summary judgment to be final, but
adjudicated counterclaims which were not brought by summary judgment, the judgment is "final-erroneous, but final." Id. at 200. 

 A judgment that grants more relief than requested is "subject to reversal, but it is not, for that
reason alone, interlocutory." Id. "In those circumstances, the order must be appealed and reversed." 
Id. at 206. If we determine Eastburn was not entitled to summary judgment on her claims, the entire
judgment of the trial court will be reversed. Page v. Geller, 941 S.W.2d 101, 102 (Tex. 1997). 
However, if we determine that "the summary judgment in favor of the plaintiff on its claims was
proper, [we must] affirm the judgment of the trial court in part, reverse in part since only a partial
summary judgment should have been rendered, and remand the case" for further proceedings in the
trial court. Bandera Elec. Coop. v. Gilchrist, 946 S.W.2d 336, 336 (Tex. 1997); Page, 941 S.W.2d
at 102; Jones v. Ill. Employers Ins. of Wausau, 136 S.W.3d 728, 743-44 (Tex. App.--Texarkana
2004, no pet.); Pinnacle Data Servs. v. Gillen, 104 S.W.3d 188, 199 (Tex. App.--Texarkana 2003,
no pet.); Klevin v. Tex. Dep't of Criminal Justice--I.D., 69 S.W.3d 341, 344 (Tex. App.--Texarkana
2002, no pet.). 

III. Standard of Review 

 A trial court's summary judgment is reviewed de novo. Laidlaw v. Waste Sys. v. City of
Wilmer, 904 S.W.2d 656, 660 (Tex. 1995); Lamar Corp. v. City of Longview, 270 S.W.3d 609, 613
(Tex. App.--Texarkana 2008, no pet.). Summary judgment is proper when a movant establishes that
there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Tex.
R. Civ. P. 166a(c); French v. Gill, 252 S.W.3d 748, 751 (Tex. App.--Texarkana 2008, pet. denied);
Powers v. Adams, 2 S.W.3d 496, 497 (Tex. App.--Houston [14th Dist.] 1999, no pet.) (citing Nixon
v. Mr. Property Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985)). In deciding whether there is a
disputed material fact issue which precludes summary judgment, proof favorable to the nonmovant
will be taken as true. Nixon, 690 S.W.2d at 548-49. We indulge every reasonable inference in favor
of the nonmovant. Limestone Prods. Distribution, Inc. v. McNamara, 71 S.W.3d 308, 311 (Tex.
2002). 

IV. Summary Judgment on Eastburn's Breach of Contract Claim Was Proper

 A. The Unambiguous Lease Provisions

 Both parties believe the lease's unambiguous language supports their position. We must first
answer the question of whether this lease contract is ambiguous. This is a question of law which we
review de novo. Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 861 (Tex. 2000). We
cannot ignore the clear language of an unambiguous contract. Consol. Petroleum Partners, I, LLC
v. Tindle, 168 S.W.3d 894, 899 (Tex. App.--Tyler 2005, no pet.). If the lease provision above can
be given a certain or definite meaning or interpretation, it is not ambiguous, and we must simply
apply the language in the lease. Lopez, 22 S.W.3d at 861. However, where there are two reasonable
interpretations of the same language in a document, ambiguity arises. Id. 

 Construction of the lease provisions was key in resolving the summary judgment. Section
5.2 of the lease stated:

 Upon receipt of Landlord's prior written approval, Tenant may from time to
time, at its own expense, alter, renovate or improve the interior of the Premises . . . so
as not to weaken or impair the strength or lessen the value of the Building . . . .


 . . . . 


 At the expiration or other termination of this Lease, and upon obtaining the
prior written consent of Landlord, Tenant shall remove such alterations, decorations,
additions and improvements and restore the Premises as provided in Section 5.5, and
if Tenant fails to do so and moves from the Premises, all such alterations,
decorations, additions and improvements shall become the property of Landlord and
Landlord may, at Tenant's expense, remove all such alterations, decorations,
additions and improvements.


Section 5.5 entitled "Trade Fixtures" provided:

 Tenant shall have the right, at the termination of this Lease, to remove any and all
trade fixtures, equipment and other items of personal property not constituting a part
of the freehold which it may have stored or installed in the Premises, including, but
not limited to, counters, shelving, showcases, chairs and movable machinery
purchased or provided by Tenant and which are susceptible of being moved without
damage to the Property . . . ; and provided further that Tenant, at its own cost and
expense, shall repair any damage to the Premises caused thereby. . . .  Further, upon
termination of this Lease, or within five (5) days thereafter, Tenant shall replace the
wall surfaces in the kitchen are [sic] of the Premises with taped and floated sheet
rock. The right granted Tenant in this Section shall not include the right to remove
any plumbing or electrical fixtures or equipment, heating or air conditioning
equipment, floor coverings (including wall-to-wall carpeting) glued or fastened to the
floors or any paneling, tile or other materials fastened or attached to walls or ceilings,
all of which shall be deemed to constitute a part of the freehold, and, as a matter of
course, shall not include the right to remove any fixtures or machinery that were
furnished or paid for by Landlord. The Premises and the immediate areas in front,
behind and adjacent to it shall be left in a broom-clean condition, and in the condition
in which they existed as of the Lease Commencement Date, normal wear and tear
excepted. . . . If Tenant shall fail to remove its trade fixtures or other property at the
termination of this Lease or within five (5) days thereafter, such fixtures and other
property not removed by Tenant shall be deemed abandoned by Tenant, and, at the
option of Landlord, shall become the property of Landlord, and Landlord may, at
Tenant's expense, remove such trade fixtures and other property and store or dispose
of the same, at Tenant's sole cost and expense. 


 Section 10.5, entitled "Surrender of Premises and Holding Over," stated:


 At the expiration of the tenancy, Tenant shall surrender the Premises in good
condition, reasonable wear and tear excepted . . . Tenant shall remove all its trade
fixtures and any alterations or improvements, subject to the provisions of Section 5.5,
before surrendering the Premises, and shall repair, at its own expense, any damage
to the Premises caused thereby. 


 When read as a whole, we believe the language in the contract is unambiguous for the
reasons discussed below. The Cammacks suggest that they were not responsible for removing the
items complained of because Section 5.5 of the lease, entitled "Trade Fixtures," does not give them
the right to remove: trade fixtures which they may have installed, plumbing, electrical heating or
air conditioning equipment, floor coverings, tiles, or other materials constituting a part of the
freehold. "Trade Fixtures" have been defined many times by the courts to include:

 such articles as may be annexed to the realty by the tenant to enable him properly or
efficiently to carry on the trade, profession, or enterprise contemplated by the tenancy
contract or in which he is engaged while occupying the premises, and which can be
removed without material or permanent injury to the freehold.


Boyett v. Boegner, 746 S.W.2d 25, 27 (Tex. App.--Houston [1st Dist.] 1988, no pet.); see
Ashford.Com, Inc. v. Crescent Real Estate Funding III, L.P., No. 14-04-00605-CV, 2005
WL 2787014, at *9 (Tex. App.--Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.) (citing
Connelly v. Art & Gary, Inc., 630 S.W.2d 514, 515 (Tex. App.--Corpus Christi 1982, writ ref'd
n.r.e.)). In other words, trade fixtures are those that are only removable without permanent or
material injury to the premises. Ashford.Com, 2005 WL 2787014, at *9; Connelly, 630 S.W.2d at
515. We must reject the Cammacks' argument because the items Eastburn required to be removed
are improvements or alterations, as admitted by Jason Cammack in his affidavit, and, by definition,
are not trade fixtures such that they could be covered by Section 5.5. 

 We harmonize and give effect to all the lease provisions in relation to the whole instrument
so that none will be rendered meaningless. Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). Here,
Sections 5.2 and 10.5 set forth the general requirement that the Cammacks must surrender the
premises in good condition, remove all trade fixtures and alterations and improvements, restore the
premises, and repair any damage to the property caused due to removal at their own expense. Even
Section 5.5 reiterates the general requirement that the Cammacks are to leave the property in
"broom-clean condition, and in the condition in which they existed as of the Lease Commencement
Date." 

 B. The Cammacks' Breach 

 When reviewing the laundry list of complaints in Eastburn's demand notice, it is clear that
several of Eastburn's complaints involved failure to clean the premises, a duty that Jason realized he
had, but, by his admission, failed to perform. Although the Cammacks removed their trade fixtures,
according to Eastburn's affidavit, they did nothing to remove their improvements and restore the
premises. Specifically, Jason admitted to not removing the 1,500-gallon grease trap, stainless steel
on the wall behind the stove, vents on the roof of the kitchen area, and the FRP from the walls. He
also admitted to throwing away Eastburn's can lights and replacing them with fluorescent lighting. 
Eastburn's uncontroverted affidavit stated the walls had not been repaired with taped and floated
drywall as required by Section 5.5. Eastburn's affidavit also mentioned the Cammacks failed to
make repairs to restore the premises to its condition prior to the lease, including the following
admitted by Jason: failure to repair holes in the roof, ceiling, floor and tile, replace Eastburn's lights
which were thrown away, and cap and cover various gas and plumbing fixtures and an electrical
conduit. Eastburn's uncontroverted affidavit also complains of the Cammacks' failure to repair
damaged or missing molding, a damaged window, and restore the ground where the grease trap was
placed after its removal. Photographs submitted in support of the summary judgment motions
confirm the condition in which the property was left. 

 Further, Eastburn's affidavit also established that the Cammacks continually failed to pay rent
on time, a fact that was never contested by the Cammacks. Also, Section 10.5 of the lease, entitled
"Surrender of Premises and Holding Over," provided:

 Tenant shall remove all its trade fixtures and any alterations or improvements,
subject to the provisions of Section 5.5, before surrendering the Premises, and shall
repair, at its own expense, any damage to the Premises caused thereby. Tenant's
obligations to observe or perform this covenant shall survive the expiration or other
termination of this lease. If Tenant remains in possession of the Premises after the
expiration of the tenancy created hereunder, whether or not with the consent or
acquiescence of the Landlord, and without the execution of a new lease, Tenant, at
the option of landlord, shall be deemed to be occupying the Premises as a tenant at
will on a month-to-month tenancy. 


Because the Cammacks failed to remove their improvements and restore the premises, they were
subject to the holdover provision under the lease. The affidavit of Jason states the lease terminated
on June 30, 2007, and that Eastburn changed the locks on July 1, 2007, and only allowed entry onto
the premises during her business hours, as stated in the lease. He complains that the Cammacks
should not be held liable for holdover damages because Section 5.5 of the lease allowed a five-day
period to remove trade fixtures. However, this five-day period was allowed only if the Cammacks
were not in default, and did not guarantee twenty-four-hour access. Thus, the Cammacks failed to
present a genuine issue of material fact to counter Eastburn's holdover claim. 

 In sum, the summary judgment evidence left no issue of material fact regarding the
Cammacks' breach of lease. 

 C. Damages and Attorney's Fees

 On appeal, the Cammacks do not challenge the amount of damages, but simply claim
Eastburn was not entitled to recover them because she was not entitled to summary judgment. We
overrule this point of error. (5) 

 The lease agreement provided attorney's fees to the prevailing party for any litigation arising
out of enforcement of the lease. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 2008). 
The Cammacks complain that Eastburn's attorney's fees are not reasonable or necessary, especially
since counsel did not furnish a time record. Production of a time record is not essential when
requesting attorney's fees. While reasonableness of an attorney's fee award often presents a question
of fact, an "affidavit filed by the movant's attorney that sets forth his qualifications, his opinion
regarding reasonable attorney's fees, and the basis for his opinion will be sufficient to support
summary judgment, if uncontroverted." In re Estate of Tyner, No 12-08-00232-CV, 2009 WL
1609963, at *4 (Tex. App.--Tyler June 10, 2009, no pet.) (citing Basin Credit Consultants, Inc. v.
Obregon, 2 S.W.3d 372, 373 (Tex. App.--San Antonio 1999, pet. denied)); Haden v. Sacks, No 01-01-00200-CV, 2009 WL 1270372, at *5 (Tex. App.--Houston [1st Dist.] May 7, 2009, no pet. h.). 
Counsel submitted an affidavit of attorney's fees totaling $19,945.00. It detailed the involvement
with the case, stated counsel's associate worked 43.8 hours at the rate of $125.00 per hour, and that
he worked 84 hours, 9.2 hours of which were billed at $150.00 per hour and 74.8 hours of which
were billed at $175.00 per hour. Eastburn's affidavit established that she was required to pay these
fees. 

 Based on a false assumption that the final order denied the "holdover and cleaning claims,"
the Cammacks argue Eastburn should not receive attorney's fees because their counsel did not
segregate the "cleaning and holdover claims" from the restoration claims. (6) When a plaintiff seeks
to recover attorney's fees where at least one claim supports an award of attorney's fees and at least
one does not, segregation is required unless the claims arise out of the same transaction and are so
interrelated that the award or denial depends on the same facts. Cotten v. Weatherford Bancshares,
Inc., 187 S.W.3d 687, 709 (Tex. App.--Fort Worth 2006, pet. denied); Lesikar v. Rappeport, 33
S.W.3d 282, 317 (Tex. App.--Texarkana 2002, pet. denied); Flint & Assocs. v. Intercontinental Pipe
& Steel, Inc., 739 S.W.2d 622, 624-25 (Tex. App.--Dallas 1987, writ denied). All of Eastburn's
claims were for breach of the lease, any of which would support an award for attorney's fees. 
Further, the claims all arose from the same transaction and involved essentially the same facts. 
Segregation of the breach of lease claims was not needed in this case. 

 Thus, unless the necessity for or the reasonableness of attorney's fees was controverted by
raising a fact question in a manner which would successfully preclude the summary judgment award
of attorney's fees, Eastburn was entitled to have them awarded to her. "[A] summary judgment
award of attorney's fees is improper where the nonmovant produces a controverting affidavit
regarding fees." AU Pharm., Inc. v. Boston, 986 S.W.2d 331, 338 (Tex. App.--Texarkana 1999, no
pet.). To constitute proper summary judgment evidence, an affidavit must be made on personal
knowledge, set forth facts which would be admissible in evidence, and show the affiant's
competence. Id.; see Tex. R. Civ. P. 166a(f). "Conclusory statements or statements based purely
on opinion are not competent summary judgment evidence." Hawthorne v. Star Enter., Inc., 45
S.W.3d 757, 759 (Tex. App.--Texarkana 2001, pet. denied); see Haden, 2009 WL 1270372, at *5. 
Although an expert witness's opinion testimony in a summary judgment affidavit can defeat a
summary judgment claim, it is the basis of the expert's claim, and not the expert's bare opinions
alone, that can settle a question as a matter of law. See Burrow v. Arce, 997 S.W.2d 229, 235 (Tex.
1999).

 Here, the affidavit submitted by the Cammacks' attorney attempting to controvert the merit
of the movant's summary judgment affidavit supporting an award of attorney's fees which had been
incurred stated, "[t]he attorney fees plaintiff's attorney claims are not necessary or reasonable, and
they are an excessive and bad faith demand" without providing a rationale upon which the statement
was based. The affidavit contains no recitation that the hourly rates charged by Eastburn's attorneys
were unreasonably high, that the time alleged to have been expended was excessive to accomplish
the work which was provided, that work performed by her attorneys was unnecessary to prosecute
the case, or that the work as alleged was not performed. In sum, there is no evidence underlying the
conclusion that Eastburn's requested attorney's fees at the trial level are unreasonable or unnecessary. 
Therefore, since the affidavit does not provide any basis for the statement made, the statement is
simply conclusory in nature. The remainder of the affidavit claims that the fees are unreasonable
because the lease did not support an award for Eastburn, the claims were not segregated, and
Eastburn's summary judgment motion was groundless. These are legal arguments, not facts, which
are resolved in Eastburn's favor. The controverting affidavit makes no mention of Eastburn's
anticipated attorney's fees on appeal, and those fees remain uncontested. 

V. Conclusion 

 We affirm the summary judgment of the trial court on Eastburn's claims, and by implication,
against the Cammacks' counterclaim regarding the security deposit. However, because the trial court
did not adjudicate the Cammacks' remaining counterclaims, we reverse and remand in part for
further proceedings consistent with this opinion. 




 Bailey C. Moseley

 Justice


Date Submitted: July 13, 2009

Date Decided: September 25, 2009


1. The lease was entered on June 6, 2005, and expired by its own terms on June 30, 2007. 
2. Fiberglass-reinforced plastic. 
3. "A motion for summary judgment shall state the specific grounds therefor. Except on leave
of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and
served at least twenty-one days before the time specified for the hearing." Tex. R. Civ. P. 166a(c). 
We do not construe the Cammacks' brief references to its counterclaims in a motion filed less than
twenty-one days before the summary judgment hearing as a proper motion for summary judgment
on the counterclaims. Also, it appears to us that the Cammacks mistakenly argued, through
references such as "[t]here is at least a fact issue whether Eastburn is entitled to keep all of the
deposit," that summary judgment on Eastburn's claims should be precluded because fact issues
existed regarding the Cammacks' amended counterclaims. 
4. Disposition of a particular issue may be inferred from other provisions of a judgment,
provided that the inference follows as a necessary implication. Matelski v. Matelski, 840 S.W.2d
124, 126 (Tex. App.--Fort Worth 1992, no writ) (citing Davis v. McCray Refrigerator Sales Corp.,
136 Tex. 296, 150 S.W.2d 377 (1941)). While we believe the trial court's grant of Eastburn's breach
of lease claim necessarily implied a ruling that Eastburn did not wrongfully withhold the security
deposit under the lease, we do not believe the same is true of the wrongful exclusion, and alleged
"failure of consideration," wherein the Cammacks sought credit for the weeks of rent in which
Eastburn allegedly failed to repair the air conditioning. 
5. The trial court awarded $36,069.06 in damages. This was supported by the uncontroverted
affidavit of Bala Duszik, owner of a construction company, who provided itemized bids and stated
the cost to restore the premises would be $19,155.00, with an additional $16,914.06 to remove the
grease trap and restore the ground. 
6. The final order simply denied the Cammacks' motion for summary judgment and granted
Eastburn's motion. It made no distinction relating to the holdover claims. 


                                           Trial
Court No. 23608

 

                                                            
                                      

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                        Opinion by Justice Moseley

                                                 Dissenting Opinion
by Justice Carter

 

 








                                                                   O P I N I O N

 

            Samuel
Coy Haagensen appeals his conviction by a jury for delivery of less than one
gram of methamphetamine.  See Tex.
Health & Safety Code Ann. §§ 481.102, 481.112 (Vernon 2010).  After obtaining a search warrant for
Haagensens residence, Officer Leigh Foreman was contacted by a confidential
informant who advised he could make a methamphetamine purchase from
Haagensen.  Based on this offer, the
police officers decided to wait before executing the search warrant.  Prior to the purchase, Foreman searched the
confidential informant and provided him with money to make the purchase.  The confidential informant purchased
methamphetamine from Haagensen and an audio recording of the purchase was
made.  Later that evening, police
officers stopped a vehicle being driven by Haagensen and arrested him.  Although no incriminating evidence was found
on Haagensens person, the money provided to the confidential informant was
found in a jacket on which Haagensen had been sitting.  The police eventually executed a search
warrant for Haagensens residence and discovered scales, baggies, and a spoon
with white residue in his bedroom.[1]  

            The
State charged Haagensen with delivery of methamphetamine based on the purchase
by the confidential informant.  The State
alleged the transaction occurred in a drug-free zone because it occurred within
1,000 feet of a day-care center.  See Tex.
Health & Safety Code Ann. § 481.134 (Vernon 2010).  The State further alleged that Haagensen had
been previously convicted of the felony offense of violation of a protective
order.  See Tex. Penal Code Ann.
§ 12.42 (Vernon 2011).  Haagensen
pled not guilty to the charged offense, not true to the drug-free zone, and
true to the prior felony conviction.  The
jury found both enhancements to be true and assessed punishment at fifteen
years imprisonment.  

            Haagensen
raises five issues on appeal.  Haagensen
argues the evidence is insufficient to support the jurys finding that the
transaction occurred in a drug-free zone. 
In addition, Haagensen claims he received ineffective assistance of
counsel and the jurys verdict is defective because it contained the wrong
cause number.

The Evidence Is Sufficient to Support the Drug-Free Zone Enhancement

            In
his first and second issues, Haagensen argues that the evidence is insufficient[2]
to support the jurys finding that the delivery occurred in a drug-free
zone.  The State alleged the offense
occurred within a drug-free zone (i.e., within 1,000 feet of Little Ark
Learning Center).  Haagensen argues the
evidence is insufficient on two bases:  (1)
the State failed to prove that the facility was licensed, certified, or
registered; and (2) the State failed to prove that the offense was committed
within 1,000 feet of the day-care center.

            In
evaluating sufficiency of the evidence, we review all the evidence in the light
most favorable to the verdict to determine whether any rational jury could have
found the essential elements of the drug-free-zone enhancement beyond a
reasonable doubt.  Brooks, 323 S.W.3d at 912 (citing Jackson, 443 U.S. at 319). 
Our rigorous legal sufficiency review focuses on the quality of the
evidence presented.  Id. at 917 (Cochran, J., concurring).  We examine legal sufficiency under the
direction of the Brooks opinion,
while giving deference to the responsibility of the jury to fairly resolve
conflicts in testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. 
Hooper v. State, 214 S.W.3d 9,
13 (Tex. Crim. App. 2007) (citing Jackson,
443 U.S. at 31819).

            Legal
sufficiency of the evidence is measured by the elements of the enhancement as
defined by a hypothetically-correct jury charge.  Young v.
State, 14 S.W.3d 748, 750 (Tex. Crim. App. 2000) (Malik applies to drug-free-zone enhancements); Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  A hypothetically correct jury charge is
one that accurately sets out the law, is authorized by the indictment, does
not unnecessarily increase the States burden of proof or unnecessarily
restrict the States theories of liability, and adequately describes the
particular offense for which the defendant was tried.  Malik,
953 S.W.2d at 240.  The hypothetically
correct jury charge cannot wholly re-write the indictment, but is not
required to track exactly all of the allegations in the indictment.  Gollihar
v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001).  [I]f the penal offense sets out various
statutory alternatives for the distinct elements of the crime, the jury charge
may contain only those alternative elements that are actually alleged in the
indictment.  Cada v. State, 334 S.W.3d 766, 773 (Tex. Crim. App. 2011).  Stated succinctly, the hypothetically-correct
jury charge must include allegations that are statutory alternatives for an
element of the offense and material variances. 
See id.  

            The
State alleged the above alleged offense was committed in, on, or within 1000
feet of a school, to-wit:  Little Ark
Preschool . . . .[3]  Section 481.134 provides:

            (d)       An offense otherwise punishable under
Section 481.112(b) . . . is a felony of the third degree if it is shown on the
trial of the offense that the offense was committed:  

                        (1)        in,
on, or within 1,000 feet of any real property that is owned, rented, or leased
to a school . . . .

 

Tex.
Health & Safety Code Ann. § 481.134(d).  Section 481.134 also defines School as a
day-care center as defined by Section 42.002, Human Resources Code.  Tex.
Health & Safety Code Ann. § 481.134(a)(5).  Section 42.002 defines Day-care center as
a child-care facility that provides care for more than 12 children  and defines Child-care facility as a
facility licensed, certified, or registered by the department . . . .  Tex.
Hum. Res. Code Ann. § 42.002 (Vernon Supp. 2010).  Operation of a day-care facility without a
license issued by the State is prohibited; violation of this prohibition
subjects the violator to civil penalties.  Tex.
Hum. Res. Code Ann. §§ 42.041(a), 42.075 (Vernon Supp. 2010).  

            The
question in this case is whether the definition of a day-care center is an
element of the offense.  Not all
definitions constitute elements of an offense. 
In Gray v. State, the Texas
Court of Criminal Appeals held that the definition of intoxicant is not an
element of the offense of driving while intoxicated.  152 S.W.3d 125, 132 (Tex. Crim. App.
2004).  The court reasoned the intoxicant
did not describe the forbidden conduct, the required culpability, any required
result, or the negation of an exception. 
Id.  

            A
definition, though, can be an element of the offense.  In Curry,
the Texas Court of Criminal Appeals held the statutory alternatives contained
in the definition of abduction were essential elements of the offense because
the alternatives described the mens rea necessary to establish the
offense.  See Curry v. State, 30 S.W.3d 394, 403 (Tex. Crim. App. 2000)
(State bound by the statutory alternative alleged).  In Curry,
the Texas Court of Criminal Appeals distinguished prior cases where the
variance did not describe the forbidden conduct, the required culpability, any
required result, or the negation of an exception.  Id.

            Recently,
the Texas Court of Criminal Appeals has suggested in dictum that the definition
of owner is an element of theft.  See Byrd v. State, 336 S.W.3d 242 (Tex.
Crim. App. 2011) (concluding State bound by its allegation because name of
owner was material variance).  This Court
has recognized the statutory definition of deliver is an element of delivery
of a controlled substance.  See Stephens v. State, 269 S.W.3d 178,
180 (Tex. App.Texarkana 2008, pet. refd) (concluding hypothetically-correct
jury charge included allegation of constructive delivery); accord Mihnovich v. State, 301 S.W.3d 354, 358 (Tex. App.Beaumont
2009, pet. refd) (concluding hypothetically-correct jury charge included
allegation of constructive delivery).  

            The
Texas Penal Code specifies that forbidden conduct, the required culpability,
any required result, or the negation of an exception form elements of an
offense.  The Texas Penal Code defines an
Element of offense as:

(A) the forbidden conduct;

(B) the required culpability;

(C) the required result;
and

(D) the negation of any
exception to the offense.

 

Tex. Penal Code Ann. § 1.07(a)(22)
(Vernon 2011).  The definition of day-care
center describes the forbidden conduct because it limits which day-care
centers create a drug-free zone.  Unlike
primary and secondary schools,[4]
not all day-care centers create drug-free zones.  Not all day-care centers, though, create
drug-free zones.  Only a day-care
center, as defined by Section 42.002, Human Resources Code creates a drug-free
zone.  Tex.
Health & Safety Code Ann. § 481.134.  If a day-care center does not serve more than
twelve students or if a day-care center is not licensed, certified, or
regulated, the day-care center does not create a drug-free zone.  Thus, in order to prove a drug-free zone
exists, the State must establish the day-care center at issue meets the
statutory definition of school.  

            The
State notes Haagensen has not provided any cases which have reversed a
drug-free-zone finding based on the definition of a school.  The State further asserts it has been unable
to find any cases in its own research. 
The State, though, has not provided this Court with any casesand we have
not discovered any in our own researchthat hold the State is not required to
prove a day-care center qualifies as a school under Tex. Hum. Res. Code Ann. § 42.002.  Although it appears this may be an issue of
first impression, the State must prove all the statutory elements of the
enhancement.

            We
conclude the definition of a day-care center contained in Tex. Hum. Res. Code Ann. § 42.002
is an essential element of the enhancement. 
Thus, the definition of a day-care center must be included in the
hypothetically-correct jury charge.  The
hypothetically-correct jury charge required the State to prove that (1) the
offense charged (2) was committed (3) within 1,000 feet of any real property
that is owned, rented, or leased to (4) a facility (5) that provides care (6) for
more than twelve children and (7) is licensed, certified, or registered by the
department.

            Haagensen
argues the State failed to prove the Little Ark Learning Center is licensed,
certified, or registered.  Officer
Foreman replied in the affirmative when asked, As you understand the law, [the
day-care center] is a school?  No objection
was made to this testimony.  Although
Foremans testimony is, perhaps, conclusory and is a mixed conclusion of fact
and law, we conclude it is some evidence that could be considered by the jury
and provides legally sufficient evidence of its existence as a
statutorily-defined child-care facility.  In addition to the testimony of Foreman, the
State presented the testimony of Marie Rushing, the child-care director at
Little Ark Learning Center.  Rushing
testified that Little Ark provides its services for more than twelve children
under the age of fourteen for less than twenty-four hours per day.  This description matches most of the statutory
requirements to meet the definition of a child-care center; the only missing
element is that there was no direct testimony that Little Ark was licensed,
certified, or registered by the Texas Department of Human Services.  Absent testimony to the contrary, we will not
assume that the First United Methodist Church was illegally operating the
child-care center and the failure to specifically identify it as being
licensed, certified, or registered was not a sufficiently consequential lapse
to invalidate its characterization as a child-care facility.  We also determine that the jury could infer
from the evidence provided by Rushing and Foreman that this was a child-care
facility as defined in the statute.  When
reviewing the sufficiency of the evidence, we must evaluate all of the evidence
in the record, both direct and circumstantial, whether admissible or
inadmissible.  Dewberry v. State, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); see Neal v. State, 256 S.W.3d 264, 277
(Tex. Crim. App. 2008).  Further, Officer
Foreman testified he based his measurements on a map he obtained at city hall
from the city engineer.[5]  We conclude, based on Foremans testimony,
that a rational person could have found that the day-care center was licensed,
certified, or registered.

            In
the alternative, Haagensen argues the State failed to prove the offense
occurred within 1,000 feet of the day-care center.  Haagensen argues the record only establishes
the offense occurred in the yard of some unidentified house on East Price
Street.  Foreman testified the
transaction occurred in the yard of the house to the east of the third house on
East Price Street.  Foreman estimated the
location was approximately 950 feet from the property line of the day-care
centers parking lot and testified it was well within the 1,000-foot circle
of the day-care center.[6]  Officer Foreman testified he based his
measurements from the parking lot of the day-care center.  Haagensen argues this parking lot actually
belongs to a neighboring church and is not leased to, owned, or rented by the
day care.  Haagensen has not directed
this Court to where the record establishes the parking lot belongs to the
neighboring church.  Further, a rational
juror could have concluded the parking lot belonged to the day-care
center.  Foreman testified the parking area
for Little Ark goes past the third house -- the house just east of the house he
was parked in front of.  The jury could
reasonably make the deduction that the parking lot was owned, rented, or leased
to the day-care center.  We note that
Rushing testified she was employed by First United Methodist Church, Little
Ark Learning Center . . . .  Thus, the
jury could have alternatively deduced, from Rushings testimony and Foremans
testimony, that the day-care center is owned by the neighboring church and the
parking lot of the neighboring church is also the parking lot of the day-care
center.  We conclude a rational juror
could have concluded, beyond a reasonable doubt, that the offense occurred in a
drug-free zone.  The evidence is sufficient.

The Record Does Not Establish Haagensen
Received Ineffective Assistance of Counsel

            Haagensen, in his third and fourth
issues, claims he received ineffective assistance of counsel in violation of
the Fifth, Sixth, and Fourteenth Amendments. 
See U.S. Const. amend V, VI, XIV. 
Haagensen also argues he received ineffective assistance of counsel in
violation of Article I, Sections 10 and 19 of the Texas Constitution.[7]  See
Tex. Const. art. I, §§ 10,
19.  Haagensen argues he received
ineffective assistance of counsel because his trial counsel failed to object to
hearsay and irrelevant evidence used in obtaining the search warrant and
evidence of extraneous bad acts.

            We
evaluate the effectiveness of counsel under the standard enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  See
Hernandez v. State, 726 S.W.2d 53, 5657 (Tex. Crim. App. 1986).  To prevail on his claim, Haagensen must show
(1) his appointed trial counsels performance fell below an objective standard
of reasonableness, and (2) a reasonable probability exists that, but for trial
counsels errors, the result would have been different.  See
Strickland, 466 U.S. at 68788.  A
reasonable probability is a probability sufficient to undermine confidence in
the outcome.  Mallett v. State, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).  An appellant has the burden of proving
ineffective assistance of counsel by a preponderance of the evidence.  Thompson
v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).  It is well-settled that any claim of
ineffective assistance must be firmly founded in the record.  Flowers
v. State, 133 S.W.3d 853, 857 (Tex. App.Beaumont 2004, no pet.); see Thompson, 9 S.W.3d at 813.

            Haagensen
argues his trial counsel was deficient because he failed to object to hearsay
and evidence of extraneous bad acts and unadjudicated offenses.  The State introduced evidence concerning
evidence used to obtain the search warrant; evidence obtained as a result of
the search warrant, including baggies, scales, syringes, pipes, and a spoon
with white residue; testimony concerning Haagensens prior arrests; and drug ledgers
which listed names and numbers of persons whom a police officer testified were
associated with narcotics use and drug trafficking.  

            The
question is whether failure to object to these alleged bad acts constitutes
ineffective assistance of counsel.  Extraneous
offenses are inherently prejudicial, and when counsel fails to object to
numerous extraneous and prejudicial matters, counsel may be ineffective.  Brown
v. State, 974 S.W.2d 289, 293 (Tex. App.San Antonio 1998, pet.
refd).  An accused must be tried only
for the offense charged; [t]he accused may not be tried for a collateral crime
or for being a criminal generally.  Jackson v. State, 320 S.W.3d 873, 882
(Tex. App.Texarkana 2010, pet. refd). 
While much of the evidence may have been admissible, some of the
evidence was clearly not admissible.  

            We
note that trial counsel may have elected not to object based on trial
strategy.  The review of defense
counsels representation is highly deferential and presumes that counsels
actions fell within a wide range of reasonable professional assistance.  Mallett,
65 S.W.3d at 63.  Much, although not all,
of the evidence complained of would have been within the trial courts
discretion to admit.  See Vaughn v. State, 931 S.W.2d 564, 566
(Tex. Crim. App. 1996) (appellant must demonstrate that if counsel had objected
on indicated grounds, trial court would have erred in overruling
objection).  We note trial counsels
reasons do not appear in the record. 
Trial counsels strategy in not objecting may have been an effort to
build rapport with the jury and prevent the jury from concluding he was
attempting to hide information from them. 
Counsel also may have not objected because an objection would have
emphasized the evidence.  If counsels
reasons for his conduct do not appear in the record and there is at least the
possibility that the conduct could have been legitimate trial strategy, we will
defer to counsels decisions and deny relief on an ineffective assistance claim
on direct appeal.  Ortiz v. State, 93 S.W.3d 79, 8889 (Tex. Crim. App. 2002).  Because trial counsels failure to object may
have been based on trial strategy, we are unable to conclude counsels actions
fell outside the wide range of reasonable professional assistance.

            Further,
even if trial counsel was deficient for failing to object, Haagensen has not
met the second prong of Strickland.  Haagensen argues he has demonstrated
prejudice because the jury was inundated with details concerning the process
for obtaining a search warrant and the jury was informed a judge had found
sufficient evidence to conclude probable cause existed for the issuance of a
search warrant.  Haagensen argues this
was done under the guise of educating the jury and was used to lead the jury
to the conclusion that the judge already knew Appellant was a known drug dealer
and the judge already believed him to be guilty.  Haagensen claims he was tried for being a
criminal generally and the jury could have concluded the confidential informant
lied.  

            We
disagree there is a reasonable probability that a different result would have
occurred.  Even though there is a
theoretical possibility the jury could have disbelieved the confidential
informant, Haagensen has not demonstrated a reasonable possibility that the jury
would have disbelieved the confidential informant.[8]  The State introduced evidence that the
confidential informant had been searched prior to the transaction, the
confidential informant had methamphetamine in his possession after the
transaction, methamphetamine was found in the car being driven by Haagensen,
and the money provided to the confidential informant had been found in a jacket
on which Haagensen had been sitting.  The
State also introduced an audio recording of the transaction.  The record before us does not demonstrate
that Haagensens trial counsel rendered ineffective assistance.

Any Error
Concerning the Cause Number on the Verdict Form Is Not Preserved for Appellate
Review

 

            In
his fifth issue, Haagensen contends his conviction must be reversed because the
jurys verdict form specified an incorrect cause number.  This case is an appeal from cause number 23608
in the trial court.  The indictment,
courts charge, and judgment all specify cause number 23608.  The jurys verdict form, though, specified cause
number 22949.[9]  Haagensen has not directed this Court to the
place in the record where he objected in the trial court to the error.  

            As
a general rule, in order to preserve a complaint for review on appeal, the
claimed error must have been presented in the trial court, thereby providing
the trial court the opportunity to correct any error during the course of the
trial.  See Tex. R. App. P.
33.1(a).  The Texas Court of Criminal
Appeals has held our system may be thought to contain rules of three distinct
kinds:  (1) absolute requirements and
prohibitions; (2) rights of litigants which must be implemented by the system
unless expressly waived; and (3) rights of litigants which are to be
implemented upon request.  Marin v. State, 851 S.W.2d 275, 279
(Tex. Crim. App. 1993), modified in part
by Cain v. State, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997); see Saldano v. State, 70 S.W.3d 873, 88788
(Tex. Crim. App. 2002).

            Haagensen
has not presented any argument or authority that the error complained of is
absolute error or waivable only error. 
The Beaumont Court of Appeals has held the error complained ofan
incorrect cause numbercan be forfeited if not objected to.  See
Metcalfe v. State, No. 09-08-00256-CR, 2009 Tex. App. LEXIS 6720, at *45
(Tex. App.Beaumont Aug. 26, 2009, pet. refd) (mem. op., not designated
for publication) (failure to object to incorrect cause number forfeited error).[10]  We agree with the Beaumont court.  By failing to object to the error in the
trial court, any error has been forfeited. 
Nothing is preserved for appellate review.  We overrule Haagensens fifth point of error.

Conclusion

            The evidence is sufficient to
support the jurys finding that the offense occurred in a drug-free zone.  We conclude the record does not establish
that Haagensen received ineffective assistance of counsel.  Any error in the cause number contained in
the verdict form has not been preserved for appellate review.  We affirm. 


 

 

            

                                                                        Bailey
C. Moseley

                                                                        Justice

 

 

DISSENTING OPINION

            The
Legislature has determined that the penalty for some drug-related offenses are
enhanced if the offense occurs in a drug-free zone.  Tex.
Health & Safety Code Ann. § 481.134 (Vernon 2010).  To determine the location of a drug-free
zone, it is necessary to examine the specific definitions of the terms as
provided by the Legislature.  One
category involves offenses that occur near institutions of higher learning,
public or private youth centers, playgrounds or public swimming pools, and
video arcade facilities.  Tex. Health & Safety Code Ann. §
481.134(b)(1)(2).  These violations
increase the punishment range for state jail felony offenses, making them
punishable as third degree felonies. 
Another category involves higher level felonies which occur within 1,000
feet of a school or public or private playground or on a school bus.  The penalty for those offenses is enhanced by
increasing the minimum punishment by five years and by doubling the maximum
fine.  Tex.
Health & Safety Code Ann. § 481.134(c).  The statute provides specific definitions of
Institution of higher learning, Playground, Video arcade facility, and Youth
center.  See Tex. Health & Safety
Code Ann. § 481.134(a)(2)(3), (6)(7). 


            The
category that the State alleged applied to this case is found in Section
481.134(d).  In those instances, state
jail felony offenses are punishable as third degree felonies if the offense
occurs:  (1) in, on, or within 1,000 feet
of any real property that is owned, rented, or leased to a school.  School is defined in the same statute:  (5) School means a private or public
elementary or secondary school or a day-care center, as defined by Section
42.002, Human Resources Code.  Tex. Health & Safety Code Ann. §
481.134(a)(5).  The indictment alleged
the offense occurred within 1000 feet of a school, to-wit:  Little Ark Preschool, Paris, Lamar County,
Texas.  The State made no attempt to
prove that Little Ark Learning Center was a private or public elementary or
secondary school and relied entirely on the alternative definition of School
as including a day-care center.  

            Stated
plainly, the State did not prove Little Ark Learning Center met all the
requirements for a day-care center.  A Day-care
center means a child-care facility . . . .  Tex. Hum.
Res. Code Ann. § 42.002(7) (Vernon Supp. 2010).  In turn, a Child-care facility means a
facility licensed, certified, or registered by the department . . . .  Tex.
Hum. Res. Code Ann. § 42.002(3). 
There was no proof that this facility was licensed, certified, or
registered.  

            I
will be the first to acknowledge that the requirements for this proof are
detailed and particularized.  See Jones
v. State, 300 S.W.3d 93, 99 (Tex. App.Texarkana 2009, no pet.) (jury
finding drug offense occurred within 1,000 feet of playground, as defined by
law, did not constitute determination offense occurred within drug-free zone
under statute applicable at relevant time). 
For whatever reason, the Legislature only intended to include day-care
facilities licensed by the State agency charged with overseeing the
centers.  But these specific definitions
and restrictions were mandated by the Legislature, and we cannot discard the
necessity for that requisite proof.  The
majority opinion finds that most of the evidence needed was provided (Little
Ark Learning Center served more than twelve children under age fourteen for
less than twenty-four hours a day) and approves the failure to produce evidence
that the facility was licensed with the observation that it is unlikely the
church would operate without a license. 
It very well may be true that the day-care center is properly licensed,
but we have no evidence of that and we cannot substitute our suppositions and
speculation for evidence.  Further, the
majority opinion shifts the burden of proof by stating, Absent testimony to
the contrary, we will not assume that the First United Methodist Church was
illegally operating the child care center . . . .  The implication is that Haagensen must
produce evidence that the center is not licensed; otherwise, the Court presumes
it is.  

            I
agree with the majority opinion that the State is required to prove the center
was licensed, certified, or registered; since no such evidence is in the
record, the State has failed to meet its burden of proof.  

            I respectfully dissent. 

 

            

                                                                        Jack
Carter

                                                                        Justice

 

Date Submitted:          May 25, 2011

Date Decided:             June 10, 2011

 

Publish











[1]Drugs
were found in other bedrooms not used by Haagensen.





[2]Haagensen
argues the evidence is legally and factually insufficient.  In the Brooks
v. State plurality opinion, the Texas Court of Criminal Appeals found no
meaningful distinction between the legal sufficiency standard and factual
sufficiency standard.  Brooks v. State, 323 S.W.3d 893, 902
(Tex. Crim. App. 2010) (plurality decision). 
A plurality of the Texas Court of Criminal Appeals abolished the factual
sufficiency review.  Id.  Since the Texas Court of
Criminal Appeals has abolished factual sufficiency review, we need not address
Haagensens challenge to the factual sufficiency of the evidence.





[3]Testimony
by the child-care director of the facility indicates that the facility is
actually called the Little Ark Learning Center, and we will refer to it that
way.





[4]The
State argues, The name of the premises alone may be sufficient to raise a
presumption that it is a day-care center that was licensed, certified or
registered by the Department.  Accord Young, 14 S.W.3d at 754.  We believe Young is distinguishable from this case.  In Young,
the Texas Court of Criminal Appeals stated, [T]he name of the premises alone
may be sufficient to raise a presumption that it is a private or public
elementary or secondary school.  Young, 14 S.W.3d at 754 (noting State
also introduced maps of drug-free zones). 
Young did not involve a
day-care center.  Under the Texas Health
and Safety Code, all private and public elementary and secondary schools create
drug-free zones.  See Tex. Health & Safety
Code Ann. § 481.134.  





[5]The
map used by Foreman was not introduced into evidence.  There is also no evidence the map has been
approved by the municipality.  See Tex.
Health & Safety Code Ann. § 481.135 (Vernon 2010) (drug-free-zone
map approved by municipality is prima facie evidence).  We note that the Texas Court of Criminal
Appeals has held a map may be probative proof of the drug-free zone boundaries
even if there is no evidence the map has been approved.  Young,
14 S.W.3d at 754.





[6]Foreman
testified he based his measurements on a map he obtained at city hall from the
city engineer and by using Google Earth. 
We note that the Texas Health and Safety Code provides a map produced by
a city engineer is admissible and prima facie evidence of drug-free zones if
approved by the municipality.  Tex. Health & Safety Code Ann. § 481.135.  No objection was made concerning the
admissibility of Foremans testimony.





[7]Haagensen
does not provide any separate argument or authority explaining how the
protections offered by the Texas Constitution differ from the protections
guaranteed by the United States Constitution.  Likewise, Haagensen does not argue that the
Texas Constitution sets out a different or higher standard than the federal Constitution.
 Consequently, we review his claims under
the federal standard.  See Moore v. State, 935 S.W.2d 124, 128
(Tex. Crim. App. 1996).





[8]We
note the confidential informant admitted he was on community supervision at the
time of the offense and had four convictions, including two felony convictions
for burglary of a habitation.  

 





[9]Haagensen
alleges on appeal that this cause number concerned another charge pending
against him.





[10]Although
the unpublished case has no precedential value, we may take guidance from it
as an aid in developing reasoning that may be employed.  Carrillo
v. State, 98 S.W.3d 789, 794 (Tex. App.Amarillo 2003, pet. refd).